# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Oduwole*, 2013 IL App (5th) 120039

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. OLUTOSIN ODUWOLE, Defendant-Appellant. |
| District & No. | Fifth District<br>Docket No. 5-12-0039 |
| Filed | March 6, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for attempting to make a terrorist threat based on the discovery of defendant's activities involving the purchase of firearms and writings concerning a mass shooting was reversed in the absence of evidence that defendant had targeted anyone in whom he intended to instill fear of some threatened violence or had taken a substantial step toward making such a threat, especially when the activities cited by the prosecution were consistent with scenarios other than terrorism. |
| Decision Under Review | Appeal from the Circuit Court of Madison County, No. 07-CF-1648; the Hon. Richard L. Tognarelli, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part. |

Counsel on Appeal

Jeffrey Urdangen and Sarah Schrup, both of Bluhm Legal Clinic, and Steven E. Art, of Loevy & Loevy, both of Chicago, for appellant.

Thomas D. Gibbons, State's Attorney, of Edwardsville (Patrick Delfino, Stephen E. Norris, and Sharon Shanahan, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE CATES delivered the judgment of the court, with opinion.

Justices Chapman and Stewart concurred in the judgment and opinion.

## OPINION

¶ 1 Following a jury trial, the defendant, Olutosin Oduwole, was convicted of attempt (making a terrorist threat), a Class 1 felony, and unauthorized possession or storage of a weapon in a public building, a Class A misdemeanor. The defendant was sentenced to 5 years in the Illinois Department of Corrections on the felony offense and a concurrent jail term of 364 days and a $1,000 fine on the misdemeanor offense. The defendant appeals only the felony conviction. On appeal, the defendant challenges the sufficiency of the evidence to sustain the conviction, the constitutionality of the statutes under which he was charged, the warrantless search of his vehicle, and the admissibility of certain items of evidence. For the reasons stated herein, we reverse.

¶ 2            BACKGROUND

¶ 3 On July 24, 2007, the defendant was charged by information with attempt (making a terrorist threat), a Class 1 felony, in violation of section 8-4(a) and section 29-20 of the Criminal Code of 1961 (Code) (720 ILCS 5/8-4(a), 29D-20 (West 2002)), and unlawful possession or storage of weapons in a public-supported building, a Class A misdemeanor, in violation of section 21-6(a) of the Code (720 ILCS 5/21-6(a) (West 2002)).

¶ 4 In August 2007, the defendant was indicted on the same offenses. A second amended indictment involving the same charges was returned in September 2011. Count I of the second amended indictment alleges that the defendant, with the intent to commit the offense of making a terrorist threat, in violation of section 29D-20 of the Code, performed a substantial step toward the commission of that offense, in that he knowingly:

"a) possessed a piece of paper containing the following hand-written words, 'send $2 to .... paypal account if this account doesn't reach $50,000 in the next 7 days then a murderous rampage similar to the VT shooting will occur at another highly populated university. THIS IS NOT A JOKE!' and;

-2-

b) possessed a loaded .25 caliber, Jennings handgun, at 418-1C Cougar Village, Southern Illinois University–Edwardsville; and

c) possessed firearm ammunition on the campus of Southern Illinois University–Edwardsville; and

d) purchased and was awaiting delivery of a Hi-Point, .380 caliber, semi-automatic handgun; and

e) purchased and was awaiting delivery of a Hi-Point, .380 caliber, semi-automatic handgun; and

f) purchased and was awaiting delivery of a Hi-Point, .380 caliber, semi-automatic handgun; and

g) purchased and was awaiting delivery of a Mac 10, .45 caliber, semi-automatic firearm;

h) wrote a note 'send $2 to .... paypal account if this account doesn't reach $50,000 in the next 7 days then a murderous rampage similar to the VT shooting will occur at another highly populated university. THIS IS NOT A JOKE!'; and

i) left a note in a vehicle on the Campus of Southern Illinois University–Edwardsville which stated 'send $2 to .... paypal account if this account doesn't reach $50,000 in the next 7 days then a murderous rampage similar to the VT shooting will occur at another highly populated university. THIS IS NOT A JOKE!'; and

j) maintained, used and had access to a Pay-Pal Account; and all in violation of 720 ILCS 5/8-4(a), and against the peace and dignity of the said People of the State of Illinois."

¶ 5   The case was tried in Madison County, Illinois, in October 2011. Police officers from Wood River and Southern Illinois University-Edwardsville (SIU-E) and an agent from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) had varying roles in the investigation and testified during the trial. A summary of the testimony and evidence pertinent to the disposition of the appeal follows.

¶ 6   The investigation which resulted in the filing of the aforementioned charges against the defendant in July 2007 arose in the shadows of the April 16, 2007, shootings on the campus of Virginia Polytechnic Institute and State University (Virginia Tech). The record shows that the State and the defendant agreed to a six-paragraph stipulation of the basic facts of the incident at Virginia Tech. The stipulation was admitted as evidence, and it was read to the jury in the State's case on the first day of trial. The stipulation noted that on April 16, 2007, Seung-Hui Cho, a full-time student, armed with a 9-millimeter Glock and a .22-caliber Walther pistol, shot and killed 32 people, students and faculty, on the campus of Virginia Tech, and then killed himself.

¶ 7   The evidence at trial showed that the defendant became the subject of an ATF investigation during the summer of 2007. The investigation was opened after Michael Copeland, a federal firearms licensee and owner of Timberline Gun Sales, reported concerns about his contacts with the defendant to ATF. At that time, the defendant was a 21-year-old student at SIU-E. He had a student housing contract and was living in an apartment on

campus during the summer session, which ran from May 20, 2007, through August 5, 2007. During the previous semester, he lived in an apartment in Wood River, Illinois.

¶ 8        Michael Copeland testified that the defendant contacted him by phone on July 3, 2007. The defendant informed Copeland that he had purchased a Vulcan Mac 10 .45-caliber pistol and three Hi-Point CF .380-caliber pistols over the Internet and that he needed a licensed transfer agent to complete the transaction. Copeland agreed to act as the transfer agent. He completed the required federal forms. He also requested a background check on the defendant and it came back approved. Copeland testified that he became concerned about the transaction because the handguns were inexpensive, high-caliber weapons and the defendant had called several times to inquire about whether the handguns had been delivered. Copeland further testified that the Hi-Point .380s have a 10-round magazine and that the Mac 10 is a .45-caliber semiautomatic with a 30-round magazine.

¶ 9        Copeland called ATF on July 12, 2007, to report his concerns. He was advised that an agent would contact him within a few days. At that time, Copeland decided that he would not transfer the weapons to the defendant until he spoke with the ATF agent. Copeland received a call from ATF Agent Paul Heiser on July 16, 2007. Copeland testified that he could not recall the specifics of that conversation. He thought he had expressed concern about the defendant's behavior, but he would not dispute the notes in Agent Heiser's report which indicated that Copeland's only concern was that the defendant might be a straw purchaser. On July 24, 2007, Heiser met with Copeland and took possession of the handguns. Copeland testified that his relationship with the defendant was limited to the purchase of the four handguns. The defendant had not sought to purchase ammunition from or through him. Copeland never met personally with the defendant. He noted that the defendant seemed impatient, but not threatening, during their phone conversations.

¶ 10        Agent Heiser testified that he called Copeland on July 16, 2007. During the conversation, he learned that the defendant had recently purchased three .380 Hi-Point pistols and one .45-caliber MAC 10 semiautomatic pistol over the Internet; that the defendant asked Copeland to act as the transfer agent; that the defendant phoned Copeland several times to inquire about whether the guns had been delivered; and that Copeland became concerned about the defendant because of the frequent calls. Agent Heiser wrote a report in which he noted that the defendant was suspected of "possibly being a straw purchaser." Heiser testified that as of that conversation, there was no suspicion that the defendant was involved in other potential criminal activity.

¶ 11        On July 16, 2007, Agent Heiser learned that the defendant had listed a residence address in Wood River, Illinois. He contacted the Wood River police department to exchange information about the defendant, and a cooperative investigation ensued. Agent Heiser also learned that the defendant was registered as a student at SIU-E. He phoned the SIU-E police department to give them a "head's up" as a matter of officer safety. Rick Weissenborn, an SIU-E detective, handled the call. Agent Heiser informed Weissenborn that the defendant had ordered weapons over the Internet. Weissenborn immediately distributed a memo to the SIU-E patrol division to alert their officers to use caution should they have contact with the defendant.

¶ 12    On July 18, 2007, Darrin Redden, an investigator with the Wood River police department, phoned Weissenborn to inform him that an unattended vehicle, registered to the defendant, was parked on North University Drive near Lewis Road. This location was on the campus of SIU-E. Weissenborn drove to that location to verify that the vehicle was registered to the defendant. Upon verifying that the vehicle was registered to the defendant, Weissenborn instructed SIU-E patrol officers to monitor any activity around the vehicle. For the next two days, Weissenborn drove past that location. He observed that the defendant's vehicle remained parked there.

¶ 13    On July 20, 2007, Weissenborn notified his supervisor, Sergeant Marty Tieman, that the defendant's vehicle had been left unattended at the roadside for more than two days. The SIU-E police department had a written tow policy which authorized the towing of a vehicle that had been abandoned or left unattended for more than 24 hours. The policy required the officer to inventory the contents of the vehicle and list all items of value before the vehicle was towed. An inventory was to be performed for purposes of protecting the owner's property and protecting the police department from an owner's claim that an item of value had been taken from the vehicle or damaged. In light of this policy, Sergeant Tieman determined that the vehicle should be towed.

¶ 14    Sergeant Tieman testified that he ran the license plate and determined that the vehicle was registered to the defendant at an address in Wood River. He searched the SIU-E database for the defendant's contact information and found two telephone numbers. Tieman called both numbers, but no one answered. He did not attempt to call again. Tieman ordered Officer Todd Schmidt to inventory the defendant's vehicle and arrange for the tow.

¶ 15    Shortly before noon on July 20, 2007, Officer Schmidt began to inventory the contents of the vehicle while Tieman stood by. Schmidt had seen Weissenborn's officer safety memo, and he knew that the vehicle belonged to the defendant. The defendant's vehicle was locked. Schmidt used a lock-out tool to unlock one of the doors. Upon entering the vehicle, Schmidt observed six rounds of .25-caliber pistol ammunition in the center console. The bullets were hard ball, not hollow point. Schmidt notified Sergeant Tieman about the ammunition and continued with the inventory. Schmidt spotted a piece of paper which was partially protruding from underneath the center console on the transmission hump. He noticed that there was a picture of an inhaler on the paper. Schmidt testified that he thought the paper might be a prescription or an item of medical importance to the vehicle owner, so he picked it up. He read the writing on the front side the of paper and concluded that it was not a prescription. Schmidt testified that the writing made no sense to him. He acknowledged that there was no mention of Virginia Tech on the front side of the paper. Schmidt turned the paper over and saw the following writings:

"I Lead She a follower,

I'm Single ~~and~~ I'm not wit her, but she

gott a throat deeper than a Sword Swallower/

glock to the head of

SEND 2 to ... paypal account

if this account doesn't reach $50,000 in the next

7 days then a murderous rampage similar to the

VT shooting will occur at another ~~prestigious~~

highly populated university. THIS IS NOT A JOKE!"

¶ 16    Schmidt testified that he considered the last six lines on the back side to be "threatening." He stated that the top lines were written in black ink and that the last six lines were written in blue ink. He did not know when the lines had been written.

¶ 17    Schmidt acknowledged that the paper was not lying out in the open and that it was not prominently displayed inside the vehicle. He further acknowledged that a person standing outside the vehicle would not be able to read the words written on it. He found no envelopes or stamps inside the vehicle.

¶ 18    Schmidt showed the paper to Sergeant Tieman. Tieman proceeded to contact his supervisors. Meanwhile, Schmidt secured the letter and ammunition in his patrol car and then returned to further inventory the vehicle. Schmidt testified that he observed a baseball bat, a large speaker, and miscellaneous clothing inside the trunk of the vehicle. He completed the inventory and remained with the vehicle until it was towed.

¶ 19    Shortly after the defendant's vehicle was towed, Schmidt obtained the defendant's on-campus address from the campus housing office. Schmidt, Tieman, and Weissenborn proceeded to the defendant's on-campus apartment. Tieman knocked on the door. A man, who identified himself as the defendant, opened the door. Tieman asked the defendant to step outside. When the defendant stepped outside, he was immediately arrested. The defendant's friend, Thomas Phillips, was also in the apartment. Phillips agreed to go to the police station for an interview. After the apartment was cleared, it was secured pending the application for a search warrant.

¶ 20    Otis Steward, the Wood River police chief, obtained a warrant to search the defendant's on-campus apartment. The warrant was executed at 5:25 p.m. on July 20, 2007. Agent Heiser and Weissenborn assisted with the search, but Steward secured the items that were seized as evidence. The items seized from the defendant's bedroom included several composition books, subject notebooks, two thumb drives, a .25-caliber cartridge found under the defendant's bed, a Cannon ZR600 camcorder, four 8-millimeter videocassettes, miscellaneous papers and notes, a wallet, a checkbook, a prescription for an inhaler, and a Dell laptop computer. A Jennings .25-caliber pistol was seized from a dresser inside the defendant's closet. The pistol had one round of ammunition in the chamber and seven rounds in the magazine. Two desktop computers were seized from common areas in the apartment.

¶ 21    Steward testified that nearly 2,000 pages of writings were seized during the search. Steward personally reviewed the writings in the notebooks taken from the defendant's bedroom. He discovered that a large percentage of the notebook entries appeared to be rap lyrics and writings related to the defendant's aspiring rap career. He noted that some of the same symbols and words that were present on the paper seized from the defendant's vehicle were also present in the notebooks. Steward testified that the seized videocassettes were

viewed and that nothing related to terrorism was observed on them.

¶ 22    Steward testified that he inspected the defendant's former apartment in Wood River. It was unoccupied and empty.

¶ 23    On October 7, 2007, Weissenborn went to the tow yard to take additional photos of the defendant's vehicle. While taking photos of the backseat, Weissenborn noticed release straps for those seats. Weissenborn testified that his curiosity got the best of him and he pulled on the straps, lowering the seat backs. He discovered a wad of clothing. When he looked through it, he found a long-sleeve shirt, a short-sleeve shirt, and a knit cap with a ski mask. Weissenborn seized the items as evidence.

¶ 24    During the course of the investigation, Weissenborn and other officers interviewed the defendant's fraternity brothers, students, and many of the defendant's instructors. Weissenborn noted that none of those interviewed expressed any concern about the defendant.

¶ 25    During cross-examination, Weissenborn conceded that he had developed no evidence that the defendant was ever going to communicate the content of the piece of paper seized from his vehicle to anyone. The search of the defendant's apartment did not yield any written plans to distribute a threat. The officers did not find a campus map. They did not find ammunition for the four handguns that the defendant had purchased over the Internet. They discovered no evidence to indicate that the defendant had purchased or sought to purchase ammunition for those handguns.

¶ 26    Weissenborn testified that he regarded the six lines on the paper seized from the vehicle as a threat to the SIU-E community. Weissenborn considered the defendant's Internet purchase of the four handguns, the defendant's possession of the handgun in his on-campus apartment, and the piece of paper found in the defendant's vehicle sufficient evidence that the defendant had engaged in substantial efforts to make a threatening communication. Weissenborn candidly stated that he could not possibly consider the six lines on the paper seized from the defendant's vehicle to represent creative writing, given that the Virginia Tech incident occurred three months prior and given his knowledge of the defendant's Internet purchase of four handguns.

¶ 27    The State also presented evidence to establish that the defendant had purchased the Jennings .25-caliber pistol in February 2007. David Welch, a licensed federal firearms transfer agent, testified that he met with the defendant on February 22, 2007, completed the federal forms, and obtained an approved background check. Welch transferred the Jennings pistol to the defendant. Welch noted that the defendant contacted him again sometime later about purchasing guns for his buddies. He advised the defendant that it was illegal for a person who lawfully purchased a firearm to then sell or give that firearm to a buddy who could not lawfully purchase one for himself. Welch testified that the defendant had done nothing to raise a suspicion that he was a terrorist, and that his only concern was that the defendant might become involved in an illegal straw purchase.

¶ 28    Regina Hayes, the police chief of SIU-E, testified that according to state law, a student must obtain written permission from the police chief of the public university to bring a weapon on campus. Hayes stated that the defendant never sought permission to bring a gun

on campus and that she never gave him permission to do so.

¶ 29 The parties stipulated that the defendant opened a PayPal account in the name of Jeff Robinson, on May 31, 2007, and that the account was still open on the date of the defendant's arrest. The State presented evidence to show that in July 2007, the defendant had signed for registered mail, addressed to Jeffrey Robinson, at the Wood River address.

¶ 30 Lindell Moore, a forensic specialist in document examination, compared the handwriting on the paper seized from the defendant's vehicle with other known writing samples of the defendant. He concluded that the writing on the paper and the samples were made by the same person.

¶ 31 Angela Horn, a forensic specialist in firearms, test-fired the defendant's Jennings pistol and determined that it functioned properly.

¶ 32 Michael Bazzell, an Alton detective who performs forensic analysis of computers and investigates computer-related crimes, analyzed the drives of the computers seized from the defendant's apartment. Bazzell did not find anything of interest on the hard drives of the desktop computers. When he checked the laptop's hard drive, he located three digital photographs of the defendant holding a small .380-caliber handgun. Bazzell also located a few "hits" when he searched the hard drive for the phrase "Virginia Tech will happen again." Bazzell noted that these "hits" were made in June 2007.

¶ 33 Bazzell also discovered that there had been a Microsoft Movie Maker on the hard drive. Bazzell testified that the Movie Maker file had been deleted and that the music and picture content could not be recovered. He noted that some captions of the file remained in a compressed drive. Bazzell explained that the reason the captions were not deleted with the other content was because the laptop has an automatic storage function. The audio files had names such as "machine G," "scream F one," and "sacred one beats," and the picture files had names of universities such as Harvard and Penn State. Bazzell acknowledged that he did not know what music or pictures accompanied the captions because the entire file had been deleted. Bazzell testified that if the time stamp on the laptop is accurate, the Movie Maker file was created on or before May 25, 2007, and it was backed up on June 6, 2007. Bazzell found no evidence to indicate that the file was transferred to another computer, an e-mail address, or another location before it was deleted.

¶ 34 Alexandria Scherff, the defendant's former girlfriend, was the State's final witness. Scherff testified that she originally owned the laptop that had been seized from the defendant's bedroom. She loaned the laptop to the defendant around May 2007, and she never used it again. Scherff testified that she never created a Movie Maker file on that computer.

¶ 35 The defense presented character testimony from a number of the defendant's friends and fraternity brothers. The testimony revealed that the defendant was born in St. Louis, Missouri; that he was the president of his fraternity and a popular student; and that he and his friends shared a hobby of shooting firearms.

¶ 36 Marcell Doyle attended SIU-E with the defendant in 2004 and 2005. Doyle testified that he promotes rap artists. He promoted the defendant's music "on his page." Doyle noted that some of the defendant's lyrics were violent and that violent lyrics are common in the rap

industry. Doyle testified that he never knew the defendant to be a violent person. He found the defendant to be a nice person.

¶ 37 Thomas Phillips testified that he was at the defendant's on-campus apartment at the time of the defendant's arrest. Phillips stated that he agreed to talk with the police. He was interviewed by Officer Weissenborn. Phillips testified that he told Weissenborn that the defendant came up with the idea for the Virginia Tech rap lyrics while they watched an episode of "Law and Order."

¶ 38 Dr. Charis Kubrin, a professor in the department of criminology, law, and society at the University of California-Irvine, and an expert in the area of rap music, testified for the defense. Dr. Kubrin reviewed the content of the paper seized from the defendant's vehicle and numerous pages in the defendant's notebooks. Dr. Kubrin opined that the writings on the paper constituted the formative stages of a rap song.

¶ 39                                             ANALYSIS

¶ 40 Initially, we consider the defendant's contention that the State failed to present sufficient evidence to prove beyond a reasonable doubt that he performed an act or acts which constituted a substantial step toward the commission of the offense of making a terrorist threat, and that he did so with the intent to make a terrorist threat.

¶ 41 When considering a challenge to the sufficiency of the evidence, the reviewing court must determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277 (1985). The trier of fact has the responsibility to assess the credibility of the witnesses and the weight to be given the testimony, to resolve inconsistencies and conflicts in the evidence, and to draw reasonable inferences from the evidence, and the reviewing court will not substitute its judgment for that of the trier of fact on those matters. *Collins*, 106 Ill. 2d at 261-62, 478 N.E.2d at 277. A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Collins*, 106 Ill. 2d at 261, 478 N.E.2d at 276.

¶ 42 In order to prove the offense of attempt (making a terrorist threat), the State must establish: (a) that the defendant performed an act which constituted a substantial step toward the commission of the offense of making a terrorist threat and (b) that the defendant did so with the intent to commit that offense. 720 ILCS 5/8-4(a), 29D-20(a) (West 2002); Illinois Pattern Jury Instructions, Criminal, No. 6.07 (4th ed. 2000). A person is guilty of making a terrorist threat when, with the intent to intimidate or coerce a significant portion of a civilian population, he in any manner knowingly threatens to commit or threatens to cause the commission of a terrorist act and thereby causes a reasonable expectation of fear of the imminent commission of a terrorist act. 720 ILCS 5/29D-20(a) (West 2002). A terrorist act is defined, in pertinent part, as any act which is intended to cause or create a risk and does cause or create a risk of death or great bodily harm to one or more persons. 720 ILCS 5/29D-10(*l*)(1) (West 2002). For purposes of this case, the trial court gave a nonpattern instruction to define "threat." Quoting from *Virginia v. Black*, 538 U.S. 343, 359 (2003), the trial court

instructed the jury that a threat is a statement by which "the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."

¶ 43    The offense of attempt is generally recognized as an inchoate offense because it is preliminary to another and more serious principal offense. See 720 ILCS Ann. 5/art. 8, Committee Comments-1961, at 576-77 (Smith-Hurd 2002). It has been long recognized that troublesome questions arise in the area of inchoate offenses in regard to what intent is necessary and when preparation to commit an offense ceases and perpetration of the offense begins. 720 ILCS Ann. 5/8-4, Committee Comments-1961, at 620 (Smith-Hurd 2002).

¶ 44    It is impossible to compile a definitive list of acts for each criminal offense which, if performed, would constitute a substantial step toward the commission of that offense. *People v. Terrell*, 99 Ill. 2d 427, 433, 459 N.E.2d 1337, 1340 (1984). What constitutes a substantial step must be determined on a case-by-case basis by evaluating the unique facts and circumstances in each particular case. *People v. Smith*, 148 Ill. 2d 454, 459, 593 N.E.2d 533, 535 (1992); *Terrell*, 99 Ill. 2d at 433, 459 N.E.2d at 1340. There must be an act or acts toward the commission of the principal offense, and the act or acts must not be too far removed in time and space from the conduct that constitutes the principal offense. *Smith*, 148 Ill. 2d at 463, 593 N.E.2d at 537 (quoting Ill. Ann. Stat., ch. 38, ¶ 8-4, Committee Comments-1961, at 499 (Smith-Hurd 1989)). A defendant does not have to complete the last proximate act to the actual commission of the principal offense, but mere preparation is not enough. *Terrell*, 99 Ill. 2d at 433, 459 N.E.2d at 1340. The facts are to be placed on a "continuum between preparation and perpetration." *Terrell*, 99 Ill. 2d at 434, 459 N.E.2d at 1341. A substantial step occurs when the acts taken in furtherance of the offense place the defendant in a dangerous proximity to success. *People v. Paluch*, 78 Ill. App. 2d 356, 359, 222 N.E.2d 508, 510 (1966).

¶ 45    Though the "substantial step" issue must be determined based upon the facts and circumstances in each particular case, the Illinois Supreme Court has said that courts may be guided by prior case law and by the Model Penal Code (Model Penal Code § 5.01(2) (1985)). *Terrell*, 99 Ill. 2d at 434-36, 459 N.E.2d at 1341-42. The Model Penal Code lists types of conduct that are to be considered sufficient as a matter of law to support an attempt conviction, as long as the conduct is strongly corroborative of the actor's criminal purpose. The types of conduct referenced in the Model Penal Code follow:

"(a) lying in wait, searching for or following the contemplated victim of the crime;

(b) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission;

(c) reconnoitering the place contemplated for the commission of the crime;

(d) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed;

(e) possession of materials to be employed in the commission of the crime, that are specially designed for such unlawful use or that can serve no lawful purpose of the actor under the circumstances;

(f) possession, collection or fabrication of materials to be employed in the

commission of the crime, at or near the place contemplated for its commission, if such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances;

(g) soliciting an innocent agent to engage in conduct constituting an element of the crime." Model Penal Code § 5.01(2) (1985).

¶ 46 The facts and circumstances in this case do not squarely fit within any of the types of conduct identified in the Model Penal Code. Even if we assess the defendant's acts in light of subsections (e) and (f) above, we cannot conclude that the PayPal account, the Movie Maker file, and the paper seized from the defendant's vehicle are materials that served no lawful purpose of the defendant. And while there is no shortage of published Illinois decisions discussing what constitutes a substantial step in a wide variety of criminal offenses, the parties have not cited any Illinois cases which discuss what constitutes a substantial step toward commission of the specific offense of making a terrorist threat, and we have found none. As such, these general resources provide no particular guidance in the analysis of the "substantial step" issue under the peculiar facts in this case.

¶ 47 The State argues that the act of crafting the language that was written on the paper seized from the defendant's vehicle, the creation of the Movie Maker file, and the opening of the PayPal account are actions which, whether taken individually or collectively, establish a substantial step toward the commission of the offense of making a terrorist threat. We disagree.

¶ 48 On the continuum between preparation and perpetration, the acts cited by the State hover much closer to preparation. The cited acts do not place the defendant in dangerous proximity to success. The paper containing the alleged threats was discovered inside the defendant's locked vehicle. The paper was not prominently displayed. It was stuck underneath the center console. No stamps or envelopes were found inside the vehicle. Officer Schmidt testified that he looked at the paper only because he noticed the inhaler logo on it and thought it might be a medical prescription. Officer Schmidt acknowledged that a person outside the vehicle could not read any of the writing on that paper. Based on Officer Schmidt's testimony, the allegedly threatening lines were written on the side opposite the logo and would have been facedown and not visible to anyone looking inside the vehicle. Detective Weissenborn conceded that there was no evidence that the defendant was going to disseminate the writing on the paper seized from his car. The record reveals that there was no evidence of a communication of the writing in any form and no evidence that the defendant ever had a plan to disseminate it. Additionally, the evidence established that the Movie Maker file had been deleted sometime prior to the day of the defendant's arrest and that the captions in that file were preserved only because the laptop had an automatic backup function. Detective Bazzell, the forensic analyst, testified that he found no evidence that the Movie Maker file had been transferred to any other person, device, or location before it was deleted. Further, PayPal accounts and Movie Maker files are not materials specially designed for unlawful purposes.

¶ 49 Finally, there is no evidence from which to find or infer that the defendant had identified a particular audience for his communications and no evidence from which to find or infer that he had targeted an individual or group in whom he intended to instill a fear that some

threatened violence would occur. In the absence of sufficient evidence that the defendant had taken a substantial step toward making a terrorist threat, his writings, as abhorrent as they might be, amount to mere thoughts. See, *e.g.*, *People v. Thoma*, 171 Ill. App. 3d 313, 525 N.E.2d 572 (1988) (defendant's conduct was mere speech which did not approach the required specificity of a substantial step toward commission of the offense of attempted patronization of a prostitute); *United States v. Gladish*, 536 F.3d 646 (7th Cir. 2008) (the requirement of evidence of a substantial step serves to distinguish individuals who present actual threats from those who may be seeking notoriety or have another agenda). The evidence in this record establishes, at best, preparatory activities that were consistent with a variety of scenarios.

¶ 50 The Illinois Supreme Court has noted that one difficulty in defining attempt is recognizing where the line is drawn between allowing the police to intervene in an unfolding course of criminal conduct before intended harm is actually done and avoiding punishment for inconclusive or equivocal acts which may or may not eventually lead to criminal harm. *Terrell*, 99 Ill. 2d at 435, 459 N.E.2d at 1341. It is difficult to draw the line to properly balance the needs of the police and the public against the rights of the individual citizens. *Terrell*, 99 Ill. 2d at 441, 459 N.E.2d at 1344; *United States v. Cea*, 914 F.2d 881, 888 (7th Cir. 1990). The solemn obligation to measure in an objective, detached manner whether the act or acts of an individual are too far removed in time and space from the conduct which constitutes the principal offense initially lies with the prosecutor and then with the trial court.

¶ 51 Whether the intervention by law enforcement here may have preempted the making of a terrorist threat or the attempt to make a threat is mere supposition. The facts and circumstances presented here, when taken in a light most favorable to the prosecution, do not prove beyond a reasonable doubt that the defendant had taken a substantial step toward making a terrorist threat. More evidence was necessary than what was shown at trial. The defendant's conviction for attempt (making a terrorist threat) must be reversed.

¶ 52 Given our disposition of this issue, we need not address the defendant's other contentions raised in this appeal.

¶ 53 CONCLUSION

¶ 54 Accordingly, the defendant's conviction of the offense of attempt (making a terrorist threat) is reversed. The defendant did not appeal his conviction and sentence for possession of a weapon in a public building, and that conviction is affirmed.

¶ 55 Affirmed in part and reversed in part.