# Illinois Official Reports

## Appellate Court

---

**_People v. Bell_, 2020 IL App (4th) 170804**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAKI BELL, Defendant-Appellant. |
| District & No. | Fourth District<br>No. 4-17-0804 |
| Filed<br>Rehearing denied | February 13, 2020<br>March 11, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Livingston County, No. 16-CF-84; the Hon. Robert M. Travers, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part.<br>Cause remanded with directions. |
| Counsel on Appeal | James E. Chadd, John M. McCarthy, and Edward J. Wittrig, of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Randy Yedinak, State's Attorney, of Pontiac (Patrick Delfino, David J. Robinson, and Luke McNeill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

Panel                JUSTICE KNECHT delivered the judgment of the court, with opinion.
Justices Turner and Cavanagh concurred in the judgment and opinion.

## OPINION

¶ 1 Defendant, Jaki Bell, appeals from his conviction and sentence for attempted escape from a penal institution. On appeal, defendant argues (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the trial court failed to properly admonish the jury pursuant to principles of Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), (3) the trial court erred when it required him to be shackled during trial without first holding a *Boose* hearing (*People v. Boose*, 66 Ill. 2d 261, 362 N.E.2d 303 (1977)), (4) the State improperly shifted its burden of proof during closing argument and constructed arguments unsupported by the evidence presented, and (5) the trial court erred when it sentenced him to a statutorily unauthorized two-year term of mandatory supervised release (MSR). We affirm in part, reverse in part, and remand with directions.

¶ 2                             I. BACKGROUND
¶ 3                             A. Information
¶ 4 In March 2016, the State charged defendant by information with attempted escape from a penal institution (720 ILCS 5/8-4(a), 31-6(a) (West 2012)). The State alleged, on or about December 22, 2013,

> "defendant, with the intent to commit the offense of [e]scape, *** performed substantial steps toward the commission of that offense, in that he knowingly and without authority possessed a hand drawn map of the Pontiac Correctional Center [(Pontiac)], he placed a dummy in his bed, and he was unresponsive to direct orders by [c]orrectional [o]fficers, in an attempt to escape from [Pontiac]."

¶ 5                             B. Jury Trial
¶ 6 In August 2017, the trial court held a two-day jury trial. Defendant, an inmate, proceeded *pro se*.

¶ 7                         1. Defendant's Restraints
¶ 8 Prior to commencing the trial, the trial court addressed the matter of defendant's restraints:

> "THE COURT: All right. Mr. Bell, we need to do something about your restraints. How has he been today?
>
> CORRECTIONAL OFFICER: He has been all right.
>
> THE COURT: All right. So if we remove his hand restraints, do you believe you will be able to keep him under control?
>
> CORRECTIONAL OFFICER: Yes, sir.
>
> THE COURT: All right. Then, Mr. Bell, we will remove your hand restraints. Your leg shackles will still remain. All right? But the jury will not be able to see that. Okay?

You should not call attention to the fact that you still have the leg shackles. And everybody will work from their tables as far as questioning of the jurors and the trial.

All right. Anything further, anything you need to know before we get started?

[PROSECUTOR]: Your Honor, is it okay if we stand when the jury comes in?

THE COURT: That would be the polite thing to do, yes. Can you do that without us hearing your shackles, though?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. All right. Well, then we will give this a try and if it becomes a problem, we will change."

¶ 9 On the second day of defendant's trial, the trial court again addressed the matter of defendant's restraints:

"THE COURT: All right. And you are asking that your cuffs be removed; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: How has he been today, any problem?

CORRECTIONAL OFFICER: No.

THE COURT: If I have the cuffs removed, are you going to be able to control him?

CORRECTIONAL OFFICER: Yes.

THE COURT: All right. Then I would ask that you remove his cuffs."

¶ 10 ### 2. *Voir Dire*

¶ 11 During *voir dire*, the trial court explained to the venire the four principles contained in Rule 431(b). After explaining the principles, the court asked each prospective juror if he or she "accepted" the principles. Each prospective juror responded in the affirmative. Defendant questioned the venire and asserted challenges to prospective jurors.

¶ 12 ### 3. Trial Conferences

¶ 13 After selecting a jury but before the presentation of evidence, the trial court admonished the jurors as follows:

"Now, from time to time we may have objections or we may have the need for a conference. The acoustics in this particular courtroom are outstanding. There is no way that I can have people stand here and argue the case with me. You would hear every word of it. And to keep the case just as clean as possible, I may ask you to step out. That will cause a little bit of a delay. Don't hold that against the parties. That is my decision. You can hold it against me if you wish. But we may have those conferences from time to time."

¶ 14 ### 4. State's Case-in-Chief

¶ 15 In its case-in-chief, the State called three witnesses: Carl Colwell, Jacob Dalton, and Robin Lopeman. Defendant cross-examined each of the State's witnesses. During its case-in-chief, the State requested and received permission to approach the witnesses for the purpose of showing them various exhibits.

¶ 16 Colwell testified he was employed by the Illinois Department of Corrections (DOC) and had been for seven years. As part of his employment, he served as a correctional officer at Pontiac Correctional Center (Pontiac).

¶ 17 On December 22, 2013, at 11 p.m., Officer Colwell conducted a "count," which was a procedure to ensure inmates were inside their assigned cells. Officer Colwell testified that defendant, at the time, was an inmate assigned to cell No. 123. Officer Colwell knocked on an observation window on defendant's cell door for the purpose of obtaining a verbal response from defendant. Defendant did not respond. Officer Colwell looked through the observation window and noticed a "homemade *** dummy" lying on the cell bed and partially covered. Officer Colwell identified State's exhibit No. 1 as a photograph of the dummy he observed inside defendant's cell. Officer Colwell did not see defendant through the observation window. Officer Colwell contacted the cell house supervisor, Lieutenant Jacob Dalton.

¶ 18 Officer Colwell testified that Lieutenant Dalton responded to defendant's cell and tried to get a verbal response from defendant. Defendant did not respond. Officer Colwell testified that Lieutenant Dalton also ordered defendant to "cuff up." Defendant did not comply. Officer Colwell testified that he attempted to open the sliding cuffing hatch on the cell door, which allowed correctional officers to cuff inmates from outside the cell and observed the hatch had been jammed with plastic sporks. Lieutenant Dalton requested the assistance of the prison's tactical unit, an extension team used when inmates refused to comply with orders. Officer Colwell left before the tactical unit arrived.

¶ 19 On cross-examination, Officer Colwell testified that he did not recall if he ever wrote defendant "a ticket" prior to December 22, 2013.

¶ 20 Lieutenant Dalton testified he worked at Pontiac, a "penitentiary," and had done so for 20 years. He had been a lieutenant since November 2013.

¶ 21 On December 22, 2013, Lieutenant Dalton responded to Officer Colwell's request for assistance at cell No. 123. Upon arrival, Lieutenant Dalton looked through the observation window and noticed a "homemade dummy" lying on the bed. The dummy was wearing a state-issued segregation jumpsuit and a blue hat and had a white sheet pulled up to its chest. Lieutenant Dalton did not see defendant through the observation window. Lieutenant Dalton testified he gave several direct orders, such as "[s]tep up" and "[c]ome to the door." Defendant did not respond. Lieutenant Dalton testified the cuffing hatch was jammed with plastic sporks when he attempted to open the hatch.

¶ 22 Based on his observations and because he was unable to obtain a response from defendant, Lieutenant Dalton requested the assistance from Pontiac's tactical unit. Lieutenant Dalton testified he was in the "cellhouse" when the tactical unit arrived. The tactical unit assembled, put on their gear, and went to defendant's cell. Lieutenant Dalton testified that the tactical unit ordered defendant "to come to the door, cuff up," the defendant "complied with that order," and the tactical unit "removed him from the cell."

¶ 23 After defendant's removal, Lieutenant Dalton went to defendant's cell but did not enter it as he wanted Pontiac's investigative unit to look at the cell for a possible crime scene. Lieutenant Dalton testified that he secured defendant's cell.

¶ 24 Lieutenant Dalton identified State's exhibit Nos. 1 and 2 as two photographs of the dummy he observed inside defendant's cell. Lieutenant Dalton testified that the photographs were

taken the day after the incident when the investigative unit went into defendant's cell. State's exhibit Nos. 1 and 2 were admitted into evidence over no objection and published to the jury.

¶ 25    State's exhibit Nos. 1 and 2 are two photographs of what appears to be a homemade dummy lying in a cell bed.

¶ 26    Lieutenant Dalton testified that the investigative unit discovered a homemade drawing, or map, of part of Pontiac inside defendant's cell on December 23, 2013, which Lieutenant Dalton had, at some point, the opportunity to observe after it was taken from the cell. Lieutenant Dalton identified State's exhibit No. 3 as a photograph of the map discovered inside defendant's cell. Lieutenant Dalton testified that the drawing depicted a "surprisingly *** decent overhead view from the [n]orth [h]ouse" of Pontiac. On cross-examination, Lieutenant Dalton testified he did not personally see the map inside defendant's cell.

¶ 27    On cross-examination, Lieutenant Dalton testified that he did not try to open the cuffing hatch, as he saw the sporks were blocking it. He also testified he did not personally secure the cell but ordered it to be secured.

¶ 28    Investigator Lopeman testified that she worked for DOC for 27½ years prior to retiring and worked at Pontiac between 2013 and 2014. During the time she worked at Pontiac, Lopeman served as an investigator with the internal affairs office.

¶ 29    In February 2014, Investigator Lopeman met with defendant, who, she testified, was serving a sentence for "aggravated battery," to discuss the incident. Investigator Lopeman testified that defendant admitted (1) "he made the dummy with three blankets and laid it on his bed," (2) he "mad[e] a map of [Pontiac]," and (3) "his intention was to escape." Investigator Lopeman testified defendant described his plan as follows:

"He was going to hide. He was hiding by the door, his cell door. And that when the officer—when he did not respond to the officer for count, he was going to—the tac team got called out. When tac opened the door, he was going to run out the door when tac team opened it and get an officer uniform and run."

Investigator Lopeman further testified that defendant stated he did not respond to the commands to stand for count because "he wanted to escape" and "wanted them to get the door open."

¶ 30    Investigator Lopeman wrote out a statement during her interview with defendant based on defendant's comments. After she completed the statement, she gave it to defendant for his review and to make any corrections. Investigator Lopeman testified defendant reviewed the statement and then signed it without making any corrections. She also signed the statement. Investigator Lopeman identified State's exhibit No. 4 as the written statement, which was admitted into evidence without objection. State's exhibit No. 4 was published to the jury during the State's closing argument.

¶ 31    State's exhibit No. 4 is the second page of an "Investigational Interview" document. It indicates the interviewee is "Bell, Jaki." It contains a signature under "Interviewee's Signature" of "J. Bell" and a signature under "Interviewer's Signature" of "Lopeman." The document contains the following handwritten summary as to what the "[i]nterviewee substantially stated" during the interview:

"Says made the dummy out of [three] blankets [and] had it [lying] in the bed. [ ]Said his plan was to escape by not answering the [officer] when they did count. The [officer] called the [lieutenant] [and] he [(]Bell[)] was still in front of the door[.] Said TACT

was called [and] if he had stayed by the door instead of getting under the bed he would have been able to escape. Says TACT opened the door [and] couldn't find him but they pulled him out from under [the] bed. If he had stayed hidden by [the] door he could have ran past TACT [and] out the front door. Says if he had got the chance to get a uniform from [an officer] he would have been out of here. Says still thinks about escaping [and] wants to go home. Got sentenced to 15 [years] but it's time to go home. Says drew the map of the prison."

¶ 32 Investigator Lopeman testified she had the opportunity to view a map that defendant admitted to making. She identified State's exhibit No. 3 as a photograph of the map defendant admitted to making, which was admitted into evidence without objection and published to the jury.

¶ 33 State's exhibit No. 3 is a photograph of what appears to be a hand-drawn aerial map. It identifies several "yard[s]," "[t]ower[s]," and buildings, including the "Adm. Building," the "North House," the "I.A. building," the "Little building," the "HCU," and the "Visiting room."

¶ 34 On cross-examination, Investigator Lopeman explained the general procedure used by Pontiac's tactical unit: "They will come to your cell. They ask you to cuff up. If you don't cuff up, they open the door and come in and take you out." Defendant asked Investigator Lopeman if she was aware that he had been previously interviewed by an officer "Attig" on December 23, 2013, to which Investigator Lopeman responded in the negative. Defendant also questioned Investigator Lopeman if she was aware of the internal affairs office having a report indicating he was assaulted by officers on December 22, 2013, to which Investigator Lopeman responded in the negative.

¶ 35 At one point during cross-examination, defendant expressed a desire to show Investigator Lopeman a defense exhibit. The following discussion then occurred:

"THE DEFENDANT: Your Honor, is there any way that I can show her this?

THE COURT: Yes. Ms. Krause [(the prosecutor)].

THE DEFENDANT: Give it to her.

THE COURT: Label that as Defendant's 1."

Investigator Lopeman testified that she had seen defense exhibit No. 1 when she received the case. Investigator Lopeman testified defense exhibit No. 1 indicated defendant had been "briefly interviewed by C.O. Attig." She testified that "C.O. Attig" was a member of "Intel," which was a unit housed in the same building as the internal affairs office.

¶ 36 On redirect examination, Investigator Lopeman testified it was not unusual for someone to have briefly interviewed an inmate prior to the time she received the investigation.

¶ 37                                        5. Defendant's Case-in-Chief

¶ 38 In his case-in-chief, defendant called two witnesses, Jamale Douglas and Keon Lipscomb. Defendant also elected to testify. Prior to testifying, the trial court excused the jury to allow defendant to be escorted to the witness box. The court followed the same procedure with Douglas and Lipscomb, both of whom were inmates.

¶ 39 Douglas testified that he was an inmate at Pontiac Correctional Center, serving a sentence for "aggravated battery to a police officer."

¶ 40 On December 22, 2013, Douglas was housed in the same area of Pontiac as defendant. Sometime between 7 a.m. and 3 p.m., Douglas heard defendant yelling and screaming, "they

trying to kill me" and "stop hitting me." Douglas testified he learned from defendant that defendant had been "attacked" by multiple correctional officers and then left in his cell. Douglas testified defendant requested medical treatment from a correctional officer sometime between 3 p.m. and 11 p.m. because he was "severely injured." Defendant was later removed from his cell by the tactical unit because he was "unresponsive."

¶ 41    Douglas testified about the general procedure to obtain medical treatment at Pontiac. He indicated that an inmate would first need to bring the matter to the attention of a correctional officer, "med tech," or nurse doing "rounds," who would then notify a lieutenant. The lieutenant would then contact the health care unit to request assistance from a nurse.

¶ 42    On cross-examination, Douglas acknowledged that he was serving sentences for "two aggravated batteries to peace officers and possession of contraband in a penal institution." Douglas also acknowledged speaking with defendant about the incident after it occurred.

¶ 43    On redirect examination, Douglas testified that the tactical unit consisted of approximately five to seven correctional officers. Douglas described the general procedure used by the tactical unit: "They will come to your cell. They ask you to cuff up. If you don't cuff up, they open the door and come in and take you out." Douglas testified he had seen one to two inmates get past the tactical unit at Pontiac since he was first imprisoned in 2012.

¶ 44    On recross-examination, Douglas testified that he personally had the tactical unit called on him approximately six or seven times.

¶ 45    Lipscomb testified that he was an inmate at Menard Correctional Center serving a sentence for murder.

¶ 46    On December 22, 2013, Lipscomb was housed in the same area of Pontiac as defendant. Lipscomb testified that he heard some "commotion" that day involving defendant. He then heard defendant request medical treatment "[a]ll that day." Lipscomb testified that Officer Colwell asked defendant to stand for count but defendant did not respond. The tactical unit was then called.

¶ 47    Lipscomb described the general process to receive medical treatment. He asserted that a "med tech" patrolled the cellhouse once a day during the 7 a.m. to 3 p.m. shift to see if any inmate requested medical treatment. A nurse may patrol during the 3 p.m. to 11 p.m. shift to give out medication, but the nurse would not entertain requests for medical treatment.

¶ 48    On cross-examination, Lipscomb testified that he observed defendant to be "beat up real bad" when he saw him on December 23, 2013. He also recalled hearing defendant "screaming out for help while they was in the cell beating him up" on December 22, 2013. Lipscomb acknowledged that he was serving additional sentences for three aggravated batteries and "manufacturing delivering cocaine."

¶ 49    On redirect examination, Lipscomb testified that he recalled seeing defendant being carried through the gallery by several correctional officers on December 22, 2013.

¶ 50    On recross-examination, Lipscomb acknowledged that he spoke with defendant about the incident several times after it occurred.

¶ 51    On redirect examination, Lipscomb testified there was nothing that would make him want to lie for defendant and he was testifying about what occurred. Defendant also asked, "Haven't I been in trouble with you before, Mr. Lipscomb?" Lipscomb responded, "Yes."

¶ 52    Defendant testified, on December 22, 2013, that he was "attacked" by two correctional officers outside his cell sometime between 7 a.m. and 3 p.m. During the attack, he was struck

in the left side of his face, which caused his mouth and nose to bleed. He was then returned to his cell, where he was "hit" in the head with a radio by a third correctional officer, which caused him to become unresponsive. Sometime between 3 p.m. and 11 p.m., defendant requested medical treatment from a correctional officer who was not involved in the attack. While that correctional officer indicated he would see what he could do for defendant, defendant never received the requested medical treatment. Unable to obtain treatment, defendant testified that he proceeded as follows:

> "What I did was what every inmate do. If you can't get a lieutenant to your cell, it is procedure. If they can't see you at count time, they will call a sergeant or a lieutenant or a major. Somebody have to come besides a C.O. So what I did was I didn't get under the bed, I didn't stand by the door. What I did was I got on top of the chuckhole. I never heard not one time that it was a lieutenant outside my cell. Never even heard [Lieutenant] Dalton. Never. After the incident, they brought me out of the cell. They say that I was being placed on like crisis watch, they had a sticker on my door said I was suicidal."

¶ 53 Defendant testified, on December 23, 2013, that he spoke with a mental health staff member, Alton Angus, about the incident. Defendant testified that Angus documented his injuries in a report. Defendant suggested the photographs in State's exhibit Nos. 1 and 2 were not actually of his cell given the fact they did not show his cell number.

¶ 54 On cross-examination, defendant acknowledged that he concealed himself during the count. Defendant denied placing sporks in the cuffing hatch or the dummy in his bed prior to concealing himself. Defendant acknowledged that he was interviewed by Investigator Lopeman, but when asked more about it, he could not recall the purpose or substance of the interview. With respect to the signed interview statement, defendant asserted it was not his signature on the document. Defendant again suggested State's exhibit Nos. 1 and 2 did not show the dummy was in his cell as the photographs did not show a cell number. Defendant acknowledged he was "currently incarcerated" for a 2008 aggravated battery and a 2014 aggravated battery.

¶ 55 On redirect examination, defendant testified he was "very familiar" with how the tactical unit worked and it consisted of approximately five correctional officers, including a correctional officer "with a camera." Defendant asserted it was "impossible" to get past the tactical unit and escape from Pontiac. Defendant testified, "If I was trying to escape, what would I cuff up for. [The tactical unit] came through the door, on the first direct order I cuffed up. If I was trying to escape from the prison, I wouldn't have cuffed up." Defendant further testified, "There [are] three gates you got to get out through in order to even get out of the prison. And once you get to the administration building, there [are] two more gates. There is no way you are escaping from this prison."

¶ 56                                6. State's Rebuttal

¶ 57 In rebuttal, the State recalled Lieutenant Dalton, Officer Colwell, and Investigator Lopeman. Defendant again cross-examined each of the State's witnesses.

¶ 58 Lieutenant Dalton testified his work shift on December 22, 2013, commenced at 11 p.m. He was not made aware of any prior incidents that day involving defendant. Lieutenant Dalton observed defendant after he was removed from his cell by the tactical unit and did not notice any injuries to defendant's person. Lieutenant Dalton testified he never heard defendant request

medical treatment and, had defendant requested medical treatment, he would have ensured defendant was accessed by a medical technician. He testified that medical staff toured the prison galleries once a shift. Lieutenant Dalton believed he and defendant had, and continued to have, a "good rapport." He did not recall any instance where he wrote defendant a ticket. Lieutenant Dalton was not aware of any incident where an inmate successfully made it past the tactical unit.

¶ 59    On cross-examination, Lieutenant Dalton acknowledged he did not observe defendant's face after he was removed from his cell.

¶ 60    Officer Colwell testified, on December 22, 2013, that his work shift commenced at 11 p.m. Officer Colwell testified he never heard defendant request medical treatment. Officer Colwell testified he would have contacted Lieutenant Dalton had defendant requested medical treatment, and Lieutenant Dalton would have contacted medical staff. Officer Colwell testified he did not observe defendant with any injuries on December 22, 2013.

¶ 61    On cross-examination, Officer Colwell testified that he observed defendant after he was removed from his cell by the tactical unit and placed in another cell. Officer Colwell also testified that he secured defendant's cell after he was removed from it.

¶ 62    Investigator Lopeman testified defendant was cooperative during the interview and did not report being attacked by correctional officers or sustaining injuries. Investigator Lopeman further testified, had defendant reported such information, she would have noted it in the written statement. Investigator Lopeman testified defendant did not say anything to her about having requested medical treatment on December 22, 2013. When asked if defendant gave any reason for why he put the dummy in his bed and the sporks in the cuffing hatch and then concealed himself, Investigator Lopeman testified "[t]hat he had been sentenced to 15 years and it was time to go home." Investigator Lopeman did not recall any other contact with defendant.

¶ 63    On cross-examination, defendant questioned whether Investigator Lopeman believed he would still have injuries at the time of the interview, to which Investigator Lopeman testified, "I have no idea."

¶ 64                                    7. Closing Arguments

¶ 65    Prior to commencing closing arguments, the trial court instructed the jury:

> "[C]losings are what the parties believe the evidence has shown. And if any statement or argument of a party is not supported by the law or the evidence, you should disregard that particular statement or argument."

¶ 66    In closing, the State argued that the evidence showed defendant intended to commit an escape from a penal institution and made a substantial step toward the commission of that offense. Specifically, the State argued that defendant had the requisite intent, as evidenced by his statement to Investigator Lopeman, and took several substantial steps to carry out that intent by (1) drawing the map of the prison; (2) gathering the items he needed to make the dummy, making the dummy, and then placing the dummy in his bed; (3) jamming the cuffing hatch; and (4) concealing himself during count and then refusing to respond or comply with orders.

¶ 67    The State acknowledged defendant presented a theory suggesting he concealed himself to obtain medical treatment and the State's witnesses were acting in concert to frame him by lying about the map, the dummy, the jammed cuffing hatch, and the interview statement. The State

argued that the evidence presented did not support defendant's theory but rather showed he was lying. Specifically, the State noted (1) both Lieutenant Dalton and Officer Colwell testified defendant would have received medical treatment if he had asked, (2) the photographs of the map and the dummy corroborated the testimony from Lieutenant Dalton and Officer Colwell, (3) the interview statement taken by Investigator Lopeman was largely consistent with the testimony from Lieutenant Dalton and Officer Colwell, (4) defendant admitted he recalled being interviewed but then became evasive when he was asked about recalling any details, and (5) defendant's credibility was suspect given his criminal convictions.

¶ 68       When arguing that the evidence presented did not support defendant's theory but rather showed he was lying, the State addressed its witnesses' credibility:

> "Investigator Lopeman, on the other hand, had no reason to lie when she testified. There is no evidence of any sort of grudge or personal beef that she had with the defendant. In fact, when she was testifying, she said that she couldn't remember having a prior investigation with the defendant. She may have had one, but there was nothing that really stuck out in her memory. She testified that the defendant at this time—and the defendant at this time didn't have anything to contradict her. He didn't present any reason, any evidence that Investigator Lopeman would have to frame him. The only evidence you have is what Investigator Lopeman told you, which is that, first of all, she is retired now. So, what motive would she have to come back here and lie to you all. She is not getting anything out of this. Second of all, she doesn't even know the defendant, really. She had no prior contact with him. So, what was her motive to lie to you to try to frame the defendant by making this statement up. There was none.

> Now, Officer Colwell and [Lieutenant] Dalton, you also have to consider their credibility. And in this case, they, again, there has been no evidence that they have any motive or reason to lie to you. There is no evidence that they had any sort of prior contact with the defendant. In fact, [Lieutenant] Dalton testified that he thought his relationship with the defendant was pretty good, that they had a pretty good rapport. So there is nothing here saying they had any reason to lie, to make this up to try to frame the defendant."

¶ 69       In response, defendant argued that he concealed himself for the purpose of obtaining medical treatment. Defendant acknowledged that both Lieutenant Dalton and Officer Colwell testified that he would have received medical treatment if he asked but defendant suggested they were lying as "every correctional officer is not a good officer." Defendant noted that he had been "jumped" on several occasions since being imprisoned and even "won lawsuits due to *** circumstances like the one we are going through today."

¶ 70       Defendant addressed the injuries he received and the alleged jammed cuffing hatch. Defendant argued that defense exhibit No. 1 showed an officer named "Attig" interviewed him on December 23, 2013, and documented that he had injuries. Defendant also argued that he spoke with a "mental health professional" named Alton Angus, who documented his injuries. Defendant argued he had a "tac team report," which allegedly indicated "nothing was jammed in the cuff hatch." After commenting on the tac team report, the State objected on the grounds he was arguing matters not admitted into evidence. The trial court sustained the State's objection and directed the jury to confine their deliberations to the evidence admitted.

¶ 71       Defendant addressed the photographs of the map and the dummy, the testimony concerning the tactical unit, and the credibility of Lipscomb and Douglas. Defendant suggested that the

photographs did not indicate the map and the dummy came from his cell as they did not depict his cell number. Defendant commented on the tactical unit, noting, in part, that the State's witnesses "never not one time mentioned a camera." Finally, defendant suggested both Lipscomb and Douglas were credible as they testified to what they personally observed.

¶ 72   In rebuttal, the State argued that Lipscomb and Douglas were not credible witnesses. The State noted their testimony concerning defendant's conduct was inconsistent, and they acknowledged they spoke with defendant after the incident. The State also noted that the jury should consider Lipscomb's and Douglas's criminal convictions and behavior while imprisoned when weighing their testimony. The State argued that defendant "got his two buddies from prison, two inmates that admitted they have had multiple conversations with the defendant before and after this incident to lie for him, to paint him as some sort of victim here." The State further argued:

> "His friends, well, nothing is going to happen to them. They are already in prison. And maybe he will owe them something. Owe them a favor or something, you know. Who knows what agreement they came to before their testimony. But the simple fact is they had nothing to lose by testifying, by lying. They had everything to gain and the defendant has everything to gain by presenting those two witnesses that lied to you."

¶ 73   Conversely, the State argued its witnesses were credible. The State specifically commented on the testimony from Lieutenant Dalton and Officer Colwell, stating:

> "[T]here is no reason not to believe the officers because there is no motive for them to lie. There is nothing presented to you in evidence today that indicates that they would have any grudge, any ill will against this defendant. There is nothing to indicate that they have any history of some sort of violence towards the defendant. In fact, neither of the officers that testified for you were officers that the defendant indicated were involved in this assault that occurred earlier. Those officers had just started their shift."

¶ 74   The State addressed defendant's various comments during closing argument that were unsupported by the evidence presented:

> "Now, the defendant claims that he has been jumped several times. He mentioned something about a lawsuit. There was no evidence of any lawsuit. He mentioned a report by Investigator Attig. He didn't call him to testify. That report is not in evidence. It should not be considered by you. He also mentioned that there is some sort of medical report. Again, not in evidence. He didn't call any doctor to testify that he had injuries. There is no evidence here other than the word of these two inmates that the defendant ever had any injuries before or after this incident."

¶ 75   The State commented on defendant's reference to a camera during his closing argument:

> "Now, the defendant also mentioned something about a camera. And, well, I am not certain exactly what the argument there is. The simple fact of the matter is there is no video in this case. If there were a video, I would have presented it for you. There is not video of the inside of the cells."

¶ 76   The State commented on the alleged assault against defendant by several correctional officers prior to his alleged attempted escape, stating:

> "But the defendant doesn't provide you with any video showing him being led to this area where this assault occurred. Doesn't show you any video of him being led back to his cell with these injuries. If there were videos, there certainly would have been a video

of that and he could have presented that to support his testimony. The reason he didn't is because there are no videos because it didn't happen."

¶ 77    In concluding, the State argued, "ultimately, [l]adies and [g]entlemen, this case really boils down to one issue, and that is credibility." The State asserted that the jury should consider "the testimony of all the witnesses" and "the exhibits that corroborate the testimony of the officers and *** Investigator Lopeman." The State argued it had proven defendant's guilt beyond a reasonable doubt.

¶ 78                                8. Jury Instructions

¶ 79    Following closing arguments, the trial court instructed the jury, in part, that (1) defendant was presumed innocent of the charge against him, (2) the State had the burden of proving defendant guilty beyond a reasonable doubt, (3) defendant was not required to prove his innocence, and (4) any statement or argument made during closing argument not based on the evidence presented should be disregarded.

¶ 80                        9. Jury Deliberations and Verdict

¶ 81    During deliberations, the jury sent a note requesting to see defense exhibit No. 1. Because the exhibit was not admitted into evidence, the trial court, without objection, directed the jury it should decide the case based upon the evidence that was admitted. The jury later returned a verdict finding defendant guilty.

¶ 82                              C. Sentencing Hearing

¶ 83    In October 2017, the trial court held a sentencing hearing. Based on the evidence and recommendations presented, the court sentenced defendant to five years' imprisonment followed by two years' MSR. The court also ordered defendant to pay certain fines and fees.

¶ 84    This appeal followed.

¶ 85                                II. ANALYSIS

¶ 86    On appeal, defendant argues (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the trial court failed to properly admonish the jury of Rule 431(b) principles, (3) the trial court erred when it required him to be shackled during trial without first holding a *Boose* hearing, (4) the State improperly shifted its burden of proof during closing argument and constructed arguments unsupported by the evidence presented, and (5) the trial court erred when it sentenced him to a statutorily unauthorized two-year term of MSR.

¶ 87                        A. Sufficiency of the Evidence

¶ 88    Defendant argues the State failed to prove him guilty beyond a reasonable doubt. Specifically, defendant asserts, "even accepting that he placed a dummy in his bed, temporarily jammed his cell's cuffing hatch, refused to comply with the correctional officers' instructions, and drew a partial map of [Pontiac], these acts did not constitute a 'substantial step' towards an escape from [Pontiac]." The State disagrees, maintaining that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt.

¶ 89    When presented with a challenge to the sufficiency of the evidence, our inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of

fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis and internal quotation marks omitted.) *People v. Harris*, 2018 IL 121932, ¶ 26, 120 N.E.3d 900. "All reasonable inferences from the evidence must be drawn in favor of the prosecution." *People v. Hardman*, 2017 IL 121453, ¶ 37, 104 N.E.3d 372. Further, we must "not substitute [our] judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876. "A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

¶ 90 In this case, defendant was charged with attempted escape from a penal institution. Section 8-4(a) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/8-4(a) (West 2012)) provides: "A person commits the offense of attempt when, with intent to commit a specific offense, he or she does any act that constitutes a substantial step toward the commission of that offense." Section 31-6(a) of the Criminal Code (*id.* § 31-6(a)) provides: "A person convicted of a felony *** who intentionally escapes from any penal institution *** commits [the offense of escape]." Thus, to prove defendant guilty of attempted escape as charged in this case, the State had to establish defendant (1) intended to commit an escape from a penal institution and (2) made a substantial step toward the commission of that offense. Defendant does not dispute the evidence was sufficient to permit the trier of fact, here the jury, to conclude he had the requisite intent to commit an escape from a penal institution; instead, he disputes whether the evidence was sufficient to permit the jury to conclude he took a substantial step toward the commission of that offense.

¶ 91 It is well established that "[m]ere preparation to commit a crime *** does not constitute an attempt to commit it." *People v. Woods*, 24 Ill. 2d 154, 158, 180 N.E.2d 475, 478 (1962). "[O]ne of the most troublesome problems in attempts is to determine when preparation to commit an offense ceases and perpetration of the [attempt] begins." 720 ILCS Ann. 5/8-4, Committee Comments-1961, at 620 (Smith-Hurd 2002); see also *People v. Terrell*, 99 Ill. 2d 427, 433, 459 N.E.2d 1337, 1340 (1984). According to the statutory language, the perpetration of the attempt commences at the point when the defendant, with the intent to commit a specific offense, does "any act that constitutes a substantial step toward the commission of that offense." 720 ILCS 5/8-4(a) (West 2012).

¶ 92 The determination of whether a defendant has done an act constituting a "substantial step" toward the commission of an offense is "dependent upon the facts of each case." *People v. Wallace*, 57 Ill. 2d 285, 292, 312 N.E.2d 263, 267 (1974); see *Terrell*, 99 Ill. 2d at 433 ("It would be an impossible task to compile a definitive list of acts which, if performed, constitute a substantial step toward the commission of every crime. Such a determination can only be accomplished by evaluating the facts and circumstances of the particular case."); *People v. Smith*, 148 Ill. 2d 454, 459, 593 N.E.2d 533, 535 (1992) ("Precisely what is a substantial step must be determined by evaluating the facts and circumstances of each particular case.").

¶ 93 In analyzing the facts of a case and whether they were sufficient to permit a jury to conclude a defendant took a substantial step toward the commission of an offense, our courts have looked for guidance from case law addressing similar factual situations as well as a list of conduct set forth in the Model Penal Code said to be indicative of a substantial step when strongly corroborative of a defendant's criminal purpose. See, *e.g.*, *Terrell*, 99 Ill. 2d at 434-36; *Smith*, 148 Ill. 2d at 459-64.

¶ 94     In this case, defendant suggests we should look to both *People v. Willis*, 204 Ill. App. 3d 590, 561 N.E.2d 1376 (1990), and *People v. Oduwole*, 2013 IL App (5th) 120039, 985 N.E.2d 316, for guidance.

¶ 95     In *Oduwole*, the court considered whether the State presented sufficient evidence to prove that the defendant "performed an act or acts which constituted a substantial step toward the commission of the offense of making a terrorist threat." *Oduwole*, 2013 IL App (5th) 120039, ¶ 40. In reaching its decision, the court found the authority cited by the parties did not reference the specific offense of making a terrorist threat and, therefore, provided "no particular guidance in the analysis of the 'substantial step' issue." *Id.* ¶ 46. For the same reason, we find *Oduwole* to be of minimal assistance in our analysis of whether the evidence was sufficient to permit the jury to conclude that defendant took a substantial step toward the commission of an escape from Pontiac.

¶ 96     *Willis*, on the other hand, addressed a claim concerning the sufficiency of the evidence to sustain a conviction for attempted escape. In that case, the evidence showed the defendant, who was housed on the fourth floor of the jail where the only exit was by elevator, caused two officers to unlock and enter his cell by refusing to give up his food tray. *Willis*, 204 Ill. App. 3d at 591-92. The defendant then used the pretense of picking up food he spilled to attack the officers and then run out of his cell. *Id.* at 592. The defendant ran past the control room, at some point actually entering the control room, and eventually ran to the elevator. *Id.* At the elevator, the defendant attacked additional officers but was then subdued. *Id.* at 592-93. This court concluded, in part, that the evidence presented was sufficient to establish the defendant "performed a substantial step toward the commission of the crime of escape." *Id.* at 593.

¶ 97     The defendant in *Willis* made further progress in pursuit of his escape than defendant did in this case. However, that does not mean the evidence was insufficient to permit this jury to conclude defendant took a substantial step in his escape effort. See *Smith*, 148 Ill. 2d at 459 ("[I]t is not necessary that a defendant complete the last proximate act in order to be convicted of attempt ***."); 720 ILCS Ann. 5/8-4, Committee Comments-1961, at 621 (Smith-Hurd 2002) ("[T]here must be an act, and the act must not be too far removed in time and space from the conduct which constitutes the principal offense.").

¶ 98     The State suggests we should look to the Model Penal Code for guidance. Defendant disagrees, contending his actions do not fit squarely into any of the conduct listed in the Model Penal Code.

¶ 99     Section 5.01(2) of the Model Penal Code (Model Penal Code § 5.01(2) (1985)) provides a list of conduct that "shall not be held insufficient as a matter of law" to support a finding of a "substantial step," so long as the conduct "is strongly corroborative of the actor's criminal purpose." The list is as follows:

"(a) lying in wait, searching for or following the contemplated victim of the crime;

(b) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission;

(c) reconnoitering the place contemplated for the commission of the crime;

(d) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed;

(e) possession of materials to be employed in the commission of the crime, that are specially designed for such unlawful use or that can serve no lawful purpose of the actor under the circumstances;

(f) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, if such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances;

(g) soliciting an innocent agent to engage in conduct constituting an element of the crime." *Id.*

See Model Penal Code § 5.01 explanatory note (1985) ("A list of kinds of conduct that corresponds with patterns found in common law cases is also provided, with the requirement that the issue of guilt be submitted to the jury if one or more of them occurs and strongly corroborates the actor's criminal purpose.").

¶ 100      Contrary to defendant's argument, we find the evidence showed defendant took several actions consistent with the conduct listed in the Model Penal Code. First, defendant can be described as having been "reconnoitering the place contemplated for the commission of the crime" when he created a detailed map of the prison from which he intended to escape. See *Smith*, 148 Ill. 2d at 464 ("We believe that 'reconnoitering' presumes that the place to be reconnoitered has already been located and identified."). Second, defendant can be described as having been possessing, collecting, and fabricating "materials to be employed in the commission of the crime, at or near the place contemplated for its commission, [and] such possession, collection [and] fabrication serve[d] no lawful purpose *** under the circumstances" when he collected the necessary items to create a dummy, fabricated the dummy, and then placed the dummy in his bed at count. Finally, defendant can arguably be described as having been "lying in wait" when he concealed himself and refused to comply with orders in order to get the tactical unit to respond and open the cell door.

¶ 101      These actions are significant given the evidence of defendant's criminal intent. We have both testimony and physical evidence indicating that defendant admitted he took these actions for the purpose of an escape from Pontiac. Given the acts taken by defendant and the fact they are strongly corroborative of his criminal purpose, we find the evidence was sufficient to permit the jury to conclude defendant took a substantial step toward the commission of an escape from a penal institution. We find the jury could reasonably conclude that defendant crossed the line where preparation ends and perpetration of the attempt begins.

¶ 102                                   B. Rule 431(b) Principles

¶ 103      Defendant argues that the trial court erred when it failed to properly admonish the jury of Rule 431(b) principles. Defendant concedes he forfeited his contention of error by failing to raise it before the trial court but asserts his forfeiture may be excused under the plain error doctrine.

¶ 104      The plain error doctrine provides a "narrow and limited exception" to the general rule of forfeiture. *People v. Reese*, 2017 IL 120011, ¶ 72, 102 N.E.3d 126. Under the plain error doctrine, a reviewing court may disregard a defendant's forfeiture and consider an unpreserved claim of error in two circumstances:

"(1) where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error and (2) where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Harvey*, 2018 IL 122325, ¶ 15, 115 N.E.3d 172.

The defendant bears the burden of persuasion in establishing plain error. *People v. Wilmington*, 2013 IL 112938, ¶ 43, 983 N.E.2d 1015.

¶ 105    We turn first to whether defendant has shown a clear or obvious error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19, 984 N.E.2d 475. The State concedes the trial court failed to properly admonish the jury of Rule 431(b) principles.

¶ 106    Rule 431(b) requires the trial court to ask each prospective juror:

"whether that juror *understands and accepts* the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." (Emphasis added.) Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

Our supreme court has said that Rule 431(b)'s language "is clear and unambiguous," requiring "a specific question and response process." *People v. Thompson*, 238 Ill. 2d 598, 607, 939 N.E.2d 403, 409 (2010). A trial court "must ask each potential juror whether he or she understands and accepts each of the principles in the rule," and "the rule requires an opportunity for a response from each prospective juror on their understanding and acceptance of those principles." *Id.*

¶ 107    In this case, the trial court explained to the venire the four principles contained in Rule 431(b). After explaining the principles, the court asked and elicited a response from each prospective juror if he or she "accepted" the principles. The court did not, however, ask each prospective juror if he or she "understood" the principles. The failure to ask this question amounts to error. See *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 35, 92 N.E.3d 494 ("Trial courts *** must not deviate in any way from the precise language chosen by the Illinois Supreme Court to be in [Rule 431(b)].") We accept the State's concession of error. In doing so, we emphasize, as we have done before, not only must trial courts be aware of the strict requirements of Rule 431(b) but so must prosecutors as they can alert the court to any improper deviation from the rule. See *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 25, 115 N.E.3d 1207.

¶ 108    Having established error occurred, we turn next to whether defendant has shown the error amounts to plain error. Defendant asserts plain error occurred because the evidence is closely balanced. The State disagrees.

¶ 109    Under the first prong of the plain error doctrine, we must consider whether "the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *People v. Sebby*, 2017 IL 119445, ¶ 51, 89 N.E.3d 675. In making this determination, we "must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Id.* ¶ 53. This inquiry "involves

an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id.*

¶ 110    Again, as charged in this case, the State had to establish that defendant (1) intended to commit an escape from a penal institution and (2) made a substantial step toward the commission of that offense. See 720 ILCS 5/8-4(a), 31-6(a) (West 2012). Defendant asserts that the evidence is close on both elements. Specifically, he contends this case turned on the jury's assessment of the credibility of witnesses because he denied the allegations against him and his testimony was not implausible. Defendant further contends, even if the jury believed the State's witnesses, the evidence was close on whether he committed an act that would constitute a substantial step toward the commission of an escape from Pontiac.

¶ 111    Investigator Lopeman testified that defendant told her months after the incident he placed the dummy in his bed and the sporks in the cuffing hatch and then concealed himself as part of an escape plan. Investigator Lopeman's testimony was corroborated by the written interview statement containing an apparent signature of defendant as well as the testimony of Officer Colwell and Lieutenant Dalton indicating that, on the day of the incident, they discovered a dummy and a jammed cuffing hatch inside defendant's cell after defendant concealed himself and refused to respond to orders. Investigator Lopeman's testimony, indicating defendant admitted to placing a dummy in his bed, and Officer Colwell's and Lieutenant Dalton's testimony, indicating they discovered a dummy in defendant's bed, was corroborated by the photographs of the dummy admitted into evidence. Investigator Lopeman's testimony and Lieutenant Dalton's testimony, indicating they reviewed a map discovered inside defendant's cell, was corroborated by the photograph of the map admitted into evidence. The State's witnesses testified that defendant did not report being injured nor did he have any noticeable injuries. With respect to the witnesses' credibility, the jury heard evidence indicating that Investigator Lopeman was retired and did not have any specific recollection of other incidents involving defendant, that Lieutenant Dalton and Officer Colwell had just begun their shifts when the incident occurred, and that Lieutenant Dalton believed he had a good rapport with defendant.

¶ 112    Conversely, defendant testified he concealed himself to have a lieutenant respond to his cell so he could receive medical treatment for the injuries he sustained in an attack earlier that day. Lipscomb and Douglas corroborated defendant's testimony indicating he had sustained injuries; however, they also suggested that defendant had other means to obtain medical treatment. With respect to the evidence introduced by the State, defendant denied signing the interview statement or having any recollection of the purpose or substance of the interview, denied placing sporks in the cuffing hatch or the dummy in his bed prior to concealing himself, and suggested the photographs of the dummy were not actually taken of his cell. Defendant suggested the State's evidence was the result of the State's witnesses acting in a concerted effort to frame him. With respect to the witnesses' credibility, all three were convicted felons and their testimony was at times either inconsistent or evasive. Additionally, both Lipscomb and Douglas acknowledged having repeated conversations with defendant about the incident after it occurred.

¶ 113    After reviewing the totality of the evidence and conducting a qualitative, commonsense assessment of the evidence within the context of the case, we find the evidence was not closely balanced. Defendant, on appeal, relies heavily on the State's comment in closing argument indicating that this case boiled down to an issue of credibility. However, as the State asserted

- 17 -

later in its closing argument, the jury's credibility evaluation required consideration of the witnesses, their testimony, and the physical evidence that supported the testimony. The evidence, considered in its entirety, shows this case was not a mere contest of credibility. We also reject defendant's argument suggesting the evidence was close on whether he committed an act that would constitute a substantial step toward the commission of an escape from Pontiac, given the multiple acts taken by defendant and the fact each act was strongly corroborative of his criminal purpose. Defendant has failed to establish plain error.

¶ 114                                                C. Shackling

¶ 115       Defendant argues the trial court erred when it required him to be shackled during trial without first holding a *Boose* hearing. Defendant concedes he forfeited his contention of error by failing to raise it before the trial court but asserts his forfeiture may be excused under the plain error doctrine.

¶ 116       As an initial matter, the State asserts defendant waived his contention of error and, therefore, it is not reviewable under the plain error doctrine. Defendant disagrees.

¶ 117       "Waiver is the intentional relinquishment of a known right, whereas forfeiture is the failure to make a timely assertion of a known right." (Internal quotation marks omitted.) *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 51, 129 N.E.3d 755. "A plain error analysis applies only to cases involving forfeiture and not those that involve affirmative acquiescence or waiver." *People v. Schoonover*, 2019 IL App (4th) 160882, ¶ 15. "[W]e must construe waiver principles liberally in favor of the criminally accused." *People v. Scott*, 2015 IL App (4th) 130222, ¶ 25, 25 N.E.3d 1257.

¶ 118       The State contends that defendant's answer to the trial court's question on the first day of trial as to whether he could stand without anyone hearing his shackles results in a waiver of his claim for purposes of appeal. We disagree. Defendant's answer to the court's specific factual question does not indicate he accepted or otherwise agreed with the court's prior ruling he would remain shackled.

¶ 119       The State also contends that defendant's request to remove his handcuffs on the second day of trial resulted in a waiver of his claim for purposes of appeal. We disagree. Because the issue of defendant's shackles was not addressed in any way during the second day of trial, defendant cannot be said to have intentionally relinquished his claim for purposes of appeal.

¶ 120       Defendant's failure to raise his claim before the trial court, as defendant concedes, results in its forfeiture for purposes of appeal. See *Sebby*, 2017 IL 119445, ¶ 48 (the failure to object at trial and raise the alleged error in a written posttrial motion results in its forfeiture). We will review his claim under the plain error doctrine.

¶ 121       Again, we turn first to whether a clear or obvious error occurred. *Eppinger*, 2013 IL 114121, ¶ 19. The State does not dispute the trial court erroneously failed to hold a *Boose* hearing before requiring defendant be shackled.

¶ 122       It is well established that "physical restraints in criminal proceedings *** may be used only upon a showing of manifest necessity." *In re Benny M.*, 2017 IL 120133, ¶ 27, 104 N.E.3d 313 (citing *People v. Allen*, 222 Ill. 2d 340, 347, 856 N.E.2d 349, 353 (2006), citing *Boose*, 66 Ill. 2d at 265-66). This is because "[p]hysical restraints *** tend to prejudice the jury against the defendant, hinder the defendant's ability to assist counsel, and offend the dignity of the judicial process." *Reese*, 2017 IL 120011, ¶ 46.

- 18 -

"Accordingly, physical restraints should be avoided whenever possible, and a criminal defendant may be shackled only when there is reason to believe he or she may try to escape or may pose a threat to the safety of people in the courtroom, or when necessary to maintain order during the trial." *Benny M.*, 2017 IL 120133, ¶ 28.

¶ 123    "The determination of whether and how to restrain a criminal defendant is left to the trial court's discretion." *Id.* ¶ 29. In *Boose*, 66 Ill. 2d at 266, the supreme court found the trial court should state on the record the reasons for allowing a defendant to remain shackled and the defendant's attorney should be given an opportunity to present reasons why the defendant should not be restrained. The *Boose* court also listed a number of factors a court should consider when reaching a decision on shackling. *Id.* at 266-67. The court emphasized "the record should clearly disclose the reason underlying the trial court's decision for the shackling and show that the accused's attorney was given an opportunity to oppose this decision." *Id.* at 267. The supreme court later made clear in *Allen*, 222 Ill. 2d at 349, that a trial court's failure to follow the procedure set forth in *Boose* before requiring restraints results in a due process violation.

¶ 124    The holdings in *Boose* and *Allen* have since been codified in Illinois Supreme Court Rule 430 (eff. July 1, 2010). *Reese*, 2017 IL 120011, ¶ 48. Rule 430 provides as follows:

"An accused shall not be placed in restraint of any form unless there is a manifest need for restraint to protect the security of the court, the proceedings, or to prevent escape. Persons charged with a criminal offense are presumed innocent until otherwise proven guilty and are entitled to participate in their defense as free persons before the jury or bench. Any deviation from this right shall be based on evidence specifically considered by the trial court on a case-by-case basis. The determination of whether to impose a physical restraint shall be limited to trial proceedings in which the defendant's innocence or guilt is to be determined, and does not apply to bond hearings or other instances where the defendant may be required to appear before the court prior to a trial being commenced. Once the trial judge becomes aware of restraints, prior to allowing the defendant to appear before the jury, he or she shall conduct a separate hearing on the record to investigate the need for such restraints. At such hearing, the trial court shall consider and shall make specific findings as to:

(1) the seriousness of the present charge against the defendant;

(2) defendant's temperament and character known to the trial court either by observation or by the testimony of witnesses;

(3) defendant's age and physical attributes;

(4) defendant's past criminal record and, more particularly, whether such record contains crimes of violence;

(5) defendant's past escapes, attempted escapes, or evidence of any present plan to escape;

(6) evidence of any threats made by defendant to harm others, cause a disturbance, or to be self-destructive;

(7) evidence of any risk of mob violence or of attempted revenge by others;

(8) evidence of any possibility of any attempt to rescue the defendant by others;

(9) size and mood of the audience;

(10) physical security of the courtroom, including the number of entrances and exits, the number of guards necessary to provide security, and the adequacy and availability of alternative security arrangements.

After allowing the defendant to be heard and after making specific findings, the trial judge shall balance these findings and impose the use of a restraint only where the need for restraint outweighs the defendant's right to be free from restraint." Ill. S. Ct. R. 430 (eff. July 1, 2010).

¶ 125    In this case, the trial court did not conduct a hearing or articulate any reason for shackling defendant throughout his trial. We also note that the prosecutor did not offer any reason for the shackling. The court inquired about defendant's temperament and the ability of a correctional officer to control defendant, but that inquiry was woefully insufficient to comply with *Boose* or Rule 430. The court was required to conduct a hearing where defendant had the opportunity to argue against the restraints. Following any argument, the court should have made specific findings related to the 10 factors provided by Rule 430 and then balanced the need for restraints against defendant's right to be free from restraint. Only after this process occurred should the court have reached a decision concerning whether to restrain defendant. The court's failure to follow the procedure established in *Boose* and later codified in Rule 430 resulted in a violation of defendant's due process rights. *Reese*, 2017 IL 120011, ¶ 49. Defendant has established error. In so finding, we emphasize not only must trial courts be aware of the procedure established in *Boose* and later codified in Rule 430, but so must prosecutors as they can alert the court to any improper deviation from the rule.

¶ 126    Having established that error occurred, we turn next to whether defendant has shown the error amounts to plain error. Defendant asserts plain error occurred because the evidence is closely balanced. For the reasons previously addressed, defendant has failed to establish first-prong plain error. Defendant also asserts plain error occurred because the error was so serious that it affected the fairness of his trial and challenged the integrity of the judicial process. The State disagrees.

¶ 127    In *Allen*, 222 Ill. 2d at 351-60, our supreme court considered whether the failure to conduct a proper *Boose* hearing constituted second-prong plain error. The defendant argued that restraining a defendant without a proper *Boose* hearing automatically constituted plain error because such an error affects the fairness of the defendant's trial and challenges the integrity of the judicial process. *Id.* at 352. The *Allen* court disagreed, finding the issue of second-prong plain error must be considered on a case-by-case basis. See *id.* at 352-53. The court found the defendant, who was represented by counsel at trial, failed to establish second-prong plain error because he did not establish "his presumption of innocence, ability to assist his counsel, or the dignity of the proceedings was compromised." *Id.* at 353. In support of that conclusion, the court noted that the "defendant wore [the restraint] into the third day of his jury trial with no objection, complaint, or any apparent difficulty consulting with his counsel." *Id.*

¶ 128    In *Reese*, 2017 IL 120011, ¶¶ 50-56, our supreme court considered whether the failure to conduct a proper *Boose* hearing constituted harmless error. In that case, the defendant proceeded *pro se* and was restrained during *voir dire*. *Id.* ¶¶ 3-10. The defendant argued that the shackling error could not be considered harmless beyond a reasonable doubt as shackling was inherently prejudicial and often had negative effects not apparent from the trial transcript. *Id.* ¶ 50. The *Reese* court disagreed, finding the issue of harmless error must be considered on a case-by-case basis. See *id.* ¶ 51. The court found the State had established that the shackling

error did not contribute to the verdict obtained, and therefore, the due process violation was harmless. *Id.* ¶ 56. In support of that conclusion, the court found (1) "the limited use of the shackles and the effort to block them from view reduced the impact of the error on [the] defendant's presumption of innocence," (2) "[a] review of the record indicate[d] defendant was not hindered in protecting his rights during [*voir dire*] despite the presence of the shackles," (3) "the trial court's placement of skirting around both counsel tables at least reduced the impact of the shackling error on the dignity of the court proceedings," and (4) "the State presented overwhelming evidence against [the] defendant." *Id.* ¶¶ 52-55.

¶ 129    Defendant contends the shackling error interfered with his ability to represent himself, diminished his presumption of innocence, and undermined the dignity of the trial proceeding. The record shows defendant was shackled throughout his trial without complaint, and there is nothing to suggest the jury heard or observed the shackles. Defendant questioned the venire, asserted challenges to prospective jurors, presented an opening statement, cross-examined each of the State's witnesses, presented defense witnesses, testified on his own behalf, made objections to evidence and argument, and presented a closing argument. Defendant suggests the shackles prevented him from seeking sidebars as needed without risking the jurors' irritation by requiring them to be routinely sent from the courtroom. Defendant fails, however, to point to anything in the record indicating he desired a sidebar. Moreover, the trial court explicitly admonished the jury it would occasionally remove them from the courtroom to deal with objections and conferences due to the acoustics in the courtroom and it should not hold any delay against the parties. Defendant also suggests the shackles prevented him from properly using exhibits during trial. While the trial court initially informed the parties that they would work from their tables, the court later allowed the State to approach its witnesses to present multiple exhibits. Defendant cites one instance in the record where he may have been prevented from following the same process. When defendant sought to cross-examine Investigator Lopeman with a defense exhibit, the court stated it would allow defendant to do so and then stated the prosecutor's name. After stating the prosecutor's name, defendant told the prosecutor, "Give it to her." While we agree it would be inappropriate if the trial court required defendant to use a third-party to transfer an exhibit when it did not adopt a similar process for the State, the record does not clearly indicate that occurred. Instead, based on the record presented, it could also be said defendant was the one who, in the presence of the jury, directed the third-party to give his exhibit to Investigator Lopeman. Defendant, who has the burden, failed to clearly establish the shackling error interfered with his ability to represent himself, diminished his presumption of innocence, or undermined the integrity of the judicial process. Defendant has failed to establish plain error.

¶ 130    In reaching this decision, we find defendant's reliance on *People v. Rippatoe*, 408 Ill. App. 3d 1061, 945 N.E.2d 132 (2011), unpersuasive. In *Rippatoe*, the appellate court found a trial court's restraint of a *pro se* defendant at a posttrial hearing without a finding of the need therefore constituted second-prong plain error. *Id.* at 1067-68. *Rippatoe* is factually distinguishable as the defendant in that case had not only his legs shackled together but also his arms shackled to his waist, which caused him difficulty in moving his hands. *Id.* at 1067. Moreover, we note this court has disagreed with *Rippatoe*'s finding that the dignity of the courtroom is demeaned by a *pro se* defendant's representation of himself at a proceeding after his trial, especially where the defendant did not express an issue with the restraints. See *People v. Kelley*, 2013 IL App (4th) 110874, ¶ 25, 986 N.E.2d 770. To the extent defendant relies on

- 21 -

*Rippatoe* for the position that restraining a *pro se* defendant *at trial* without a proper *Boose* hearing automatically constitutes second-prong plain error, we reject that position.

¶ 131                                                 D. Closing Argument

¶ 132       Defendant argues that the State improperly shifted its burden of proof during closing argument and constructed arguments unsupported by the evidence presented. Defendant concedes he forfeited his contention of error by failing to raise it before the trial court but asserts his forfeiture may be excused under the plain error doctrine.

¶ 133       We turn first to whether a clear or obvious error occurred. *Eppinger*, 2013 IL 114121, ¶ 19. The State argues no error occurred.

¶ 134       "A prosecutor has wide latitude in making a closing argument and is permitted to comment on the evidence and any fair, reasonable inferences it yields." *People v. Glasper*, 234 Ill. 2d 173, 204, 917 N.E.2d 401, 419 (2009). Prosecutors must not "argue assumptions or facts not contained in the record." *Id.* Prosecutors also must not shift the burden of proof by suggesting to the jury that the defendant was obligated to present evidence of his innocence at trial. *Id.* at 212. When reviewing a closing argument for error, we must consider the argument "in its entirety, and the challenged remarks must be viewed in their context." *Id.* at 204. A prosecutor's "[s]tatements will not be held improper if they were provoked or invited by the defense counsel's argument." *Id.*

¶ 135       Defendant contends that the State improperly shifted its burden of proof during closing argument. Defendant largely points to the State's comments indicating there was no evidence presented to support defendant's theory that he concealed himself to obtain medical treatment and he was being framed by the State's witnesses. Most of the State's comments can be construed as proper comments concerning the credibility of defendant's theory in light of the evidence presented or proper responsive comments to defendant's suggestions and argument at trial rather than improper comments implying defendant had a duty to present evidence of his innocence. However, we find some comments crossed the line and suggested that the State was shifting the burden of proof to defendant. For example, we find the following comments troublesome: (1) "[D]efendant didn't call any doctor to testify that he had injuries" and (2) "But the defendant doesn't provide you with any video showing him being led to this area where this assault occurred. Doesn't show you any video of him being led back to his cell with these injuries. If there were videos, there certainly would have been a video of that and he could have presented that to support his testimony." These comments were improper and unnecessary.

¶ 136       Defendant also contends that the State construed arguments unsupported by the evidence presented. Defendant points to the State's comments suggesting (1) he possibly entered into an agreement with Lipscomb and Douglas where he would owe them a favor and (2) Lipscomb and Douglas had nothing to lose by testifying and lying. The State did not introduce any evidence to suggest an agreement was entered into between defendant and his witnesses, nor did it present any evidence to suggest Lipscomb and Douglas would be somehow exempt from prosecution for perjury if they lied on the stand. The State's comments were improper and unnecessary.

¶ 137       Having established error occurred, we turn next to whether defendant has shown the error amounts to plain error. Defendant asserts plain error occurred because the evidence is closely balanced. For the reasons previously addressed, defendant has failed to establish first-prong

plain error. Defendant also asserts plain error occurred because the error was so serious that it affected the fairness of his trial and challenged the integrity of the judicial process. The State disagrees.

¶ 138    A defendant may establish second-prong plain error "only if the State's comments were so inflammatory or so flagrant that [the] defendant was denied a fair trial." *People v. Euell*, 2012 IL App (2d) 101130, ¶ 22, 969 N.E.2d 935.

¶ 139    The State's improper burden-shifting comments were tied to the lack of evidence supporting defendant's theory suggesting he concealed himself for the purpose of seeking medical treatment and the State's witnesses conspired to frame him. The State did not directly state that defendant had the burden to introduce evidence of his innocence; rather, the State's improper comments, when considered in context of the entirety of the State's closing argument, primarily concerned the credibility of defendant's theory in light of the evidence presented. Moreover, the jury was properly instructed following closing arguments that the State had the burden of proving defendant guilty beyond a reasonable doubt and defendant was not required to prove his innocence. See *Glasper*, 234 Ill. 2d at 214 (relying in part on the fact the jury was properly instructed when concluding the defendant failed to establish second-prong plain error).

¶ 140    The State's improper evidentiary comments were tied to Lipscomb's and Douglas's credibility. The State did not, however, rely solely on the improper grounds to attack their credibility; rather, the State also cited their inconsistent testimony, criminal histories and wrongdoings, and repeated conversations with defendant about the incident. The additional, improper comments were cumulative. Moreover, the jury was properly instructed before, during, and after closing arguments that any statement or argument made during closing argument not based on the evidence presented should be disregarded.

¶ 141    Considering the State's improper comments in the context of the entirety of its closing argument, we find they were not so inflammatory or so flagrant to conclude he was denied a fair trial. Defendant has failed to establish plain error.

¶ 142                                              E. MSR

¶ 143    Defendant argues that the trial court erred when it sentenced him to a statutorily unauthorized two-year term of MSR. Defendant concedes he forfeited his contention of error by failing to raise it before the trial court but asserts his forfeiture may be excused under the plain error doctrine. The State agrees.

¶ 144    A trial court has no discretion when it comes to imposing a statutorily mandated MSR term. *People ex rel. Berlin v. Bakalis*, 2018 IL 122435, ¶ 18, 106 N.E.3d 979. The imposition of a statutorily unauthorized sentence affects substantial rights, which may be considered by a reviewing court even if not properly preserved in the trial court. *People v. Hicks*, 181 Ill. 2d 541, 545, 693 N.E.2d 373, 375 (1998).

¶ 145    Attempted escape from a penal institution is a Class 3 felony. 720 ILCS 5/8-4(a), 8-4(c)(4), 31-6(a) (West 2012). Section 5-4.5-40(*l*) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-4.5-40(*l*) (West 2012)) provides, "[e]xcept as provided in [s]ection 3-3-8 or 5-8-1 [of the Unified Code (*id.* § 3-3-8, 5-8-1)], the *** [MSR] term shall be one year upon release from imprisonment" for a Class 3 felony. Neither section 3-3-8 nor 5-8-1 provides an

exception to a one-year MSR term for the Class 3 felony of attempted escape from a penal institution. See *Id.* § 3-3-8, 5-8-1.

¶ 146     Because only a one-year MSR term was statutorily authorized, the trial court lacked the authority to impose a two-year MSR term against defendant. We accept the State's concession, reverse the part of the trial court's sentencing judgment imposing a two-year MSR term, and remand the cause for the issuance of a new sentencing judgment reflecting a sentence of five years' imprisonment followed by one-year MSR.

¶ 147                                III. CONCLUSION

¶ 148     We affirm in part, reverse in part, and remand with directions for the issuance of a new sentencing judgment reflecting a sentence of five years' imprisonment followed by one-year MSR.

¶ 149     Affirmed in part and reversed in part.

¶ 150     Cause remanded with directions.