NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 190888-U

NO. 4-19-0888

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 5, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Edgar County |
| JUSTIN HEFNER, | ) | No. 18CF39 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Steven L. Garst, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices DeArmond and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*: The evidence was sufficient to convict defendant of (1) false personation of a peace officer and (2) false personation of a peace officer while attempting to commit the felony of unlawful restraint.

¶ 2    On October 30, 2019, a jury convicted defendant, Justin Hefner, of false personation of a peace officer (720 ILCS 5/17-2(b)(3) (West 2018)) and false personation of a peace officer while attempting to commit a felony (720 ILCS 5/17-2(b)(5) (West 2018)). Defendant did not file a posttrial motion. On December 10, 2019, the trial court sentenced defendant to two years of probation. Defendant did not file a motion to reconsider his sentence.

¶ 3    Defendant raises three issues. First, he claims the State failed to prove that defendant falsely personated a peace officer. Second, defendant posits even if the State's evidence was sufficient to prove defendant personated a peace officer, the evidence was insufficient because the State did not prove defendant did not have the authority to question or arrest the person

defendant sought. Third, defendant alleges the State failed to prove he attempted to commit the offense of unlawful restraint.

¶ 4 We affirm the judgment of the circuit court.

¶ 5 I. BACKGROUND

¶ 6 On February 17, 2018, defendant went to the Edgar County Sheriff's Department and asked to speak to Deputy Matthew Smith (Smith). Defendant was wearing (1) a camouflage jacket, (2) a tactical style bulletproof vest with a pistol holster and his name badge attached, (3) a U.S. Army ball cap, (4) a second steel-plate bulletproof vest under his sweatshirt, and (5) a private investigator badge with an American flag emblem over it which obscured the word "private." Defendant had two pairs of handcuffs tucked into his belt, which Smith noted while defendant was removing his jacket and tactical vest at Smith's request before allowing defendant into the secure area of the building. Defendant said he was a contractor for the United States Department of Defense (DOD) through his organization, Constitutional Wounded Warriors (CWW), and told Smith and Deputy Dee Burgin (Burgin) he sought their assistance with questioning and possibly arresting Bradley Collier (Bradley). When asked for his credentials, defendant gave Smith a small black ID holder with a piece of paper that identified CWW. As well, defendant told Smith and Burgin he had "nationwide" arrest authority. After Burgin talked to defendant in an interview room, Burgin discussed with Smith and another deputy they could not permit defendant to leave because he was "crazy." Deputies then arrested defendant for false personation of a peace officer, and false personation of a peace officer while attempting to commit the felony of unlawful restraint.

¶ 7 The State charged defendant with false personation of a government official (720 ILCS 5/17-2(b)(2) (West 2018)), false personation of a peace officer, and false personation of a

peace officer while attempting a felony (unlawful restraint). Although the trial court set a bond, defendant never posted bond and remained in custody. On March 15, 2018, defendant filed a motion for fitness examination, which the trial court granted. The court found defendant unfit for trial, and defendant was transported to the Alton Mental Health Center for treatment. On January 10, 2019, the court found defendant fit for trial. However, on February 5, 2019, defendant filed another motion for fitness examination, which the court granted. On March 28, 2019, the court again found defendant unfit to stand trial, and remanded defendant to the Illinois Department of Human Services for inpatient treatment. On August 19, 2019, the court found defendant fit to stand trial. Throughout the course of the matter, and despite warnings from the court, defendant filed countless *pro se* documents.

¶ 8        The State elected to proceed to trial on false personation of a peace officer, and false personation of a peace officer while attempting to commit a felony. On October 29, 2019, the jury trial commenced.

¶ 9        The State presented five witnesses, and defendant elected to testify. Their testimony relevant to the issues herein we summarize below.

¶ 10        Jacob Robinson (Robinson) related he was a patrol officer for the City of Paris, Illinois. On February 9, 2018, defendant appeared at the police department front desk, requesting a welfare check on Carrie Collier (Carrie). Defendant was wearing "full military gear" with an "unidentifiable badge that had a United States patch over it." Defendant's name was embroidered on his uniform, above his chest, and he had a file full of papers. Robinson noted the first page named the CWW and had Carrie's contact information. Defendant wanted to go with Robinson to a specific location, which Robinson discovered on arrival, though he suspected earlier, was Carrie's home she shared with Bradley.

¶ 11 Robinson and defendant met Sergeant Roger Finley (Finley) at the Colliers' home. Robinson followed defendant to the front door, on which defendant knocked. Bradley answered the door, and Robinson noted Bradley was "unsure" whether he wanted to permit defendant in the house. Both Bradley and defendant became "agitated" as defendant was "persistent" on gaining access to do the welfare check. Bradley eventually let Robinson and defendant inside, where they remained for approximately five minutes. While inside, Robinson permitted defendant to do the welfare check on Carrie. Later that day, Robinson spoke to Bradley and defendant, and advised defendant he was not to return to the Colliers' home.

¶ 12 Finley testified defendant was dressed in "military apparel." Finley, however, was not involved in any conversation with Bradley or defendant and, on arrival at the Colliers' home, walked around the outside of the residence. Finley did not enter the home until several minutes after Robinson and defendant did.

¶ 13 Bradley testified he is married to Carrie, and that the two of them were home with their two children when Robinson and defendant arrived. Bradley is employed by the Illinois Department of Innovation and Technology. Bradley noted defendant was wearing a badge, and believed there was an unspecified "weapon" in the vest defendant was wearing over his "full gear." Defendant was familiar to Bradley, as defendant was married to one of Carrie's high school friends. Bradley, however, allowed defendant in the home because the officers "okayed it." After defendant and the others left, Bradley called the sheriff's department to ask why the officers brought defendant to the home. Subsequently, Bradley sought and obtained an order of protection against defendant.

¶ 14 Smith testified he was aware of the order of protection when asked on February 17, 2018, to meet with defendant at the Edgar County sheriff's office. When Smith went to the front

window at the sheriff's office to meet with defendant, defendant was dressed in (1) a camouflage jacket, (2) a tactical style bulletproof vest with a pistol holster and his name badge attached, and (3) a U.S. Army ball cap. Affixed to the vest was defendant's name and a private investigator badge with an American flag emblem covering part of the badge. Defendant said he was an investigator for the DOD, so Smith asked defendant for his credentials. Defendant gave Smith a small black ID holder, with a small piece of paper that said "Constitutional Wounded Warriors." To Smith, the credentials did not appear similar to those he was accustomed to seeing.

¶ 15 Defendant advised Smith he wanted deputies to go with him to the Collier's and help defendant take Bradley into custody. Defendant advised Bradley was a civilian in possession of Federal Bureau of Investigation (FBI) documents. Defendant wanted to bring Bradley back to the sheriff's office and upon doing so, contact the United States Department of Homeland Security. Smith, or one of the others present, asked defendant if he had the authority to arrest. Defendant said he had such authority. Smith asked defendant to remove the weapon in his holster and place it in the weapons locker, which defendant did. Smith and Burgin then allowed defendant through the first set of security doors, and asked defendant if he had any other weapons. Defendant had a pocketknife which he gave to Smith, Burgin, or a correctional officer who was also present. One of them asked defendant to remove his jacket and tactical vest, which defendant did. One of the three noticed then that defendant had two pairs of handcuffs in his waistband.

¶ 16 Defendant was again asked while in the vestibule whether he had the authority to arrest, and he again advised he did. After defendant removed his jacket and tactical vest, Smith searched defendant and noted defendant appeared to have a second vest under his sweatshirt. Defendant was asked to remove the second vest, which he also did. Smith testified that, generally, defendant had been cooperative to this point. As described further below, from this area defendant

followed Burgin to an interview room. Smith heard some of Burgin's interview of defendant, including defendant's continuing statements he had arrest powers and was investigating a security breach for the DOD.

¶ 17    Near the end of Burgin's interview of defendant, Smith heard defendant consent to a search of defendant's vehicle, which search Smith helped conduct. Smith observed defendant's vehicle had flashing lights that were white and purple. Such colors did not signify anything official, Smith testified. Defendant's vehicle contained (1) another investigator badge, (2) two sets of zip tie handcuffs, (3) a 100-count bundle of standard zip ties, (4) a roll of duct tape, (5) a firearm in a case, and (6) ammunition for the firearm. Smith identified photographs depicting all of the items defendant had on his person, and those that were found in defendant's vehicle. Smith's body camera recorded the interaction with defendant, which recording Smith also identified.

¶ 18    The trial court admitted the photographs as well as Smith's body camera video recording, which the State played for the jury. The body camera recording is consistent with Smith's testimony, as well as Burgin's later testimony. Among other statements, defendant can be clearly heard telling the deputies he had arrest powers.

¶ 19    Burgin testified he was also a deputy sheriff for Edgar County, and was working February 17, 2018, when defendant came to the sheriff's office. Burgin too had seen the order of protection against defendant. Burgin heard defendant tell Smith "he was a DOD contractor and that he had come to, I believe, make an arrest and was asking for us to help go with him to effect an arrest." Burgin saw the handle of a pistol on defendant's chest, and heard Smith ask defendant to lock the pistol so defendant could come into the office and talk to them. Burgin asked defendant if he had arrest power, to which defendant replied that he did and it was "nationwide." Burgin noted defendant was "dressed similar to a police officer" given the pistol, badge, handcuffs, Mace,

and bulletproof vest designed "to wear if you were going to battle with a rifle." From the vestibule, Burgin took defendant to an interview room at the back of the jail. This interaction was also recorded, and the recording admitted by the trial court and played for the jury.

¶ 20    During Burgin's interview of defendant, he asked defendant if defendant just wanted to talk to Bradley, or take him into custody. Defendant replied he wanted to do "both." Burgin asked defendant at least two more times if he sought to place Bradley in custody to which defendant advised he did. As well, Burgin asked defendant if he had arrest powers in Illinois, to which defendant answered he had arrest powers nationwide.

¶ 21    Defendant testified he created and owns the CWW and that it is a not-for-profit to "help veterans and it's pretty much to help protect the country." The DOD assigned CWW a number which permits it to "investigate any service." Defendant said he saw FBI files on Bradley's Facebook page, and that concerned him, so he went to the sheriff's department. Defendant identified himself as with CWW and advised he was a DOD contractor. Defendant wanted the deputies to help him "question, and if not arrest" Bradley because of the FBI files on Facebook. In response to defense counsel's question if he intended to arrest Bradley, defendant said he "just wanted to ask questions" but if "you got grounds for arrest, then, yeah, you can make an arrest." Defendant added the "police have to do that," which is why he went to the sheriff's office. Several times defendant also testified he simply wanted to bring the security breach to the attention of the deputies.

¶ 22    Defendant admitted telling the deputies he was investigating a security breach, and that he wanted to arrest Bradley. As well, he acknowledged he did not have contact information for a supervisor despite claiming to be under the supervision of DOD, and acknowledged that no

one from DOD had trained him to investigate security breaches. Defendant, after discovering Bradley's security breach, did not report that to the DOD.

¶ 23        The jury found defendant guilty of false personation of a peace officer and false personation of a peace officer while attempting to commit a felony. Defendant did not file a posttrial motion. On December 10, 2019, the trial court sentenced defendant to two years of probation. From the sentencing order, defendant appealed.

¶ 24                                II. ANALYSIS

¶ 25                A. Sufficiency of the Evidence and Standard of Review

¶ 26        We will not reverse a conviction on appeal "for insufficient evidence unless the evidence is so improbable or unsatisfactory that a reasonable doubt remains as to the defendant's guilt." *People v. Harris*, 2018 IL 121932, ¶ 26. We view the evidence in the light most favorable to the State and consider whether any "rational trier of fact" could have concluded the evidence established the crime's essential elements beyond a reasonable doubt. *Id.* We do not retry the accused, and we draw any reasonable inference in favor of the State. *Id.* Throughout, the fact finder's responsibility is to weigh the evidence, resolve conflicts within the evidence, and draw reasonable inferences therefrom. We will not substitute our judgment "for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses." *People v. Brown*, 2013 IL 114196, ¶ 48.

¶ 27        B. No Waiver of the Right to Appeal the Sufficiency of the Evidence

¶ 28        Preliminarily, we note that when a defendant does not raise an issue in a posttrial motion, that inaction generally results in waiver of the issue on appeal. One exception, however, is a challenge to the sufficiency of the evidence. *People v. Allen*, 288 Ill. App. 3d 502, 505 (1997). Thus, defendant did not waive his right to appeal the sufficiency of the evidence.

¶ 29                              C. False Personation of a Peace Officer

¶ 30            False personation of a peace officer is when a person "knowingly and falsely represents himself or herself to be *** [a] peace officer." (720 ILCS 5/17-2(b)(3) (West 2018)). A "peace officer" is one who by virtue of his employment and the law has the duty to make arrests, or who by statute has been granted powers similar to those granted a person employed as a law enforcement officer by an agency of the State of Illinois. 720 ILCS 5/2-13 (West 2018). For the purposes of the false personation offenses, "peace officer" includes those "officers, agents, or employees of the federal government commissioned by federal statute to make arrests," including criminal investigators for the DOD. See 720 ILCS 5/2-13(7) (West 2018).

¶ 31            Defendant argues the evidence was insufficient to prove he personated a peace officer. He urges he was just attempting to receive assistance from the sheriff's department. We disagree. It was well within the jury's purview to conclude defendant was falsely personating a peace officer within the statutory definition.

¶ 32            Defendant was wearing (1) a badge, (2) a bulletproof vest with his name on it, (3) a pistol holster on the front of his vest holding what turned out to be a BB gun, and (4) handcuffs tucked into his belt. He had a second bulletproof vest under his sweatshirt, along with hand restraints, duct tape, zip ties, a cased firearm, and ammunition for that firearm in his vehicle. Deputy Burgin testified defendant was dressed as a police officer would.

¶ 33            Defendant told deputies he was a "contractor" with the DOD, was investigating Bradley, and had "nationwide" arrest authority. Defendant produced identification when asked, purportedly to support his claims, and told the deputies they should contact the Pentagon to confirm his authority. Defendant told the deputies he had come to make an arrest, though he suggested at times he sought the assistance of the deputies.

¶ 34    The jury was able to observe defendant's appearance and demeanor on the video recordings, as well as hear and judge his statements. Similarly, the jury was able to evaluate defendant's testimony. What the jury heard and saw corroborated the testimony of the other witnesses. Thus, the convictions are not based solely on the testimony of the other witnesses.

¶ 35    Viewing the evidence in the light most favorable to the State, we believe the evidence was sufficient for the jury to conclude defendant knowingly and falsely represented he was a peace officer. The jury believed the State's version of events, and rejected the defendant's. We will not substitute our judgment for the jury's on the weight given the evidence, the inferences the jury drew, or the credibility of the witnesses. Although defendant presented a different interpretation of his actions than the State, that does not meet the standard for reversal. The evidence is not so improbable or unsatisfactory that reasonable doubt remains as to defendant's guilt of the offense of false personation of a peace officer.

¶ 36    D. The Evidence Was Not Insufficient That Defendant Did Not

Have the Authority to Arrest

¶ 37    Defendant argues the State's evidence was insufficient because it had to prove defendant was not one somehow authorized by federal law to make arrests, pursuant to the language of section 2-13(7) of the Criminal Code of 2012 cited above. 720 ILCS 5/2-13(7) (West 2018). We disagree for two reasons.

¶ 38    First, the cases cited by defendant are inapposite. The primary case on which defendant relies involved a defendant who was in an auto accident and displayed a gold star to the responding officer. See *People v. Bolling*, 181 Ill. App. 3d 845, 846-47 (1989). When asked for his driver's license, the defendant said he was with the military police. *Id.* The State called a military witness to testify the defendant was not a military police officer, but the court did not

hold, nor can it be interpreted as holding, that the State was required to present evidence from an authorizing authority. *Id.* at 848.

¶ 39     The other case cited by defendant was a prosecution for false personation of an attorney in which the defendant represented he was authorized to practice before the patent bar. See *People v. Harris*, 394 Ill. App. 3d 28, 33 (2009). Although the State was required to present evidence from which the jury could conclude the defendant was not authorized to practice patent law, the court did not hold the State had to do so by presenting evidence from some licensing authority. *Id.* In fact, the evidence was a stipulation that the defendant at one time was a member of the patent bar, but had been removed from the roster of patent attorneys. *Id.*

¶ 40     Second, there was sufficient evidence for the jury to conclude defendant was not authorized by law, federal or otherwise, to make arrests. Defendant displayed a private investigator badge, and, when asked for his credentials, provided the ID holder identifying him as with CWW. He could not provide the name of a supervisor, or the contact information for someone the deputies could contact to confirm his authority. At trial, defendant confirmed the foregoing. In addition, he admitted he did not have any DOD identification, and the Commercial and Government Entity number he offered the deputies permitted him to submit bids as a vendor to the DOD. Defendant testified his last contact with the DOD was to determine if he wanted to do work for the DOD not relative to a security breach involving Bradley. Further, defendant testified no one from the DOD had trained him to investigate.

¶ 41     Thus, again viewing the evidence in the light most favorable to the State, we believe the evidence was sufficient for the jury to conclude defendant did not have the authority to arrest Bradley. This is a reasonable and permissible inference for the jury to have drawn, and we will not disturb that.

¶ 42                    E. False Personation of a Peace Officer While Attempting

to Commit the Felony of Unlawful Restraint

¶ 43          Defendant urges we should find there was insufficient evidence to convict him of

attempting to commit unlawful restraint to support the guilty verdict for false personation of a

peace officer while attempting to commit a felony. 720 ILCS 5/17-2(b)(5) (West 2018). A person

commits unlawful restraint when, without authority, he or she knowingly detains another. 720

ILCS 5/10-3(a) (West 2018). A person commits attempt when he or she, with intent to commit an

offense, takes any act that is a substantial step toward committing the offense. 720 ILCS 5/8-4(a)

(West 2018). Whether a person has taken such a "substantial step" is dependent on the facts and

circumstances of each particular case. *People v. Bell*, 2020 IL App (4th) 170804, ¶ 92. Therefore,

a court must carefully evaluate the facts of each individual case. *Id.*

¶ 44          To sustain a conviction for an attempt, a defendant need not have finished "the last

proximate act" for the commission of the offense. *People v. Sweigart*, 2013 IL App (2d) 110885,

¶ 20. As well, the accused's abandonment of criminal purpose after commission of a "substantial

step" is not a defense. *Id.* On the other hand, simple preparation is not sufficient to support an

attempt conviction. *Id.* In evaluating whether a defendant's actions constitute the requisite

"substantial step," courts often refer to the Model Penal Code. See, *e.g.*, *Bell*, 2020 IL App (4th)

170804, ¶ 99. Section 5.01 of the Model Penal Code (Model Penal Code § 5.01(2) (1985))

describes actions that should not be found insufficient to sustain a substantial step finding, if the

action corroborates the offender's criminal purpose. *Id.* The conduct listed includes

(1) "reconnoitering" the planned location of the offense; (2) possessing items to be utilized that

can serve no legal purpose given the circumstances; (3) possessing, fabricating, or collecting items

to be used to commit the offense, near the location contemplated for the execution of the crime, if

such action could serve no lawful purpose given the circumstances; and (4) soliciting an innocent agent to assist in the wrongful conduct which constitutes one of the elements of the offense. *Id.*

¶ 45      Defendant posits no rational trier of fact could have concluded defendant was attempting to unlawfully restrain Bradley because he went to law enforcement first and sought the deputies' assistance. We disagree.

¶ 46      Among other things, the jury could have concluded defendant was reconnoitering Bradley's home when he conducted the welfare check on Carrie. The jury could have concluded when he sought help with the welfare check, he was enlisting innocent agents to assist in the commission of the offense.

¶ 47      Further, defendant possessed either on his person or in his vehicle: (1) two pairs of handcuffs, (2) duct tape, (3) hand restraints, (4) zip ties, (5) a BB gun that appeared to be a genuine firearm, (6) a firearm and ammunition for the firearm, (7) flashing lights for his vehicle, and (8) Mace. Thus, the jury could have concluded defendant possessed materials that had no other legal purpose given the circumstances, other than to be utilized in the unlawful detention of Bradley. Similarly, a reasonable conclusion is that defendant possessed, collected, or fabricated these items at or near the location contemplated for the detention without any other legal purpose. Finally, the jury could have concluded defendant solicited the assistance of innocent parties to commit the offense by going to the sheriff's office. Thus, defendant took a number of steps consistent with the nature of the steps the Model Penal Code describes.

¶ 48      Defendant's actions are particularly significant because they corroborate his stated intent to arrest Bradley. The jury could have concluded defendant planned the detention, gathered the equipment, and that his last step was to enlist the deputies. Viewing the evidence in the light most favorable to the State, it was sufficient for the jury to have reasonably concluded that

defendant was not merely preparing to commit unlawful detention, and instead took a substantial step sufficient to constitute attempt.

¶ 49                                  III. CONCLUSION

¶ 50          For the foregoing reasons, we affirm the circuit court's judgment.

¶ 51          Affirmed.